Erica C. Mirabella
MIRABELLA LAW, LLC
132 Boylston Street, 5th Floor
Boston, MA  02116
(617) 580-8270
(617) 583-1905 (fax)
erica@mirabellaLLC.com

*Counsel for Plaintiffs*
[Additional Counsel listed on signature page]

UNITED STATES DISTRICT COURT

CALIFORNIA NORTHERN DISTRICT (OAKLAND)

| | |
|---|---|
| MICHELLE MARINO and, DAMIANO DIPAOLA, individually, and on Behalf of all others similarly situated, | Case No. 4:14-MD-02555-JSW |
| | **AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| THE COCA-COLA COMPANY and COCA-COLA REFRESHMENTS USA, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Michelle Marino and Damiano DiPaola (collectively "Plaintiffs"), individually, and on behalf of similarly situated persons, through Plaintiffs' undersigned counsel, allege the following against defendants The Coca-Cola Company and Coca-Cola Refreshments USA, Inc. (collectively "Defendants"):

**PRELIMINARY STATEMENT**

1.      This case is about Coca-Cola, one of the most famous and respected brands in the world.  Faced with clear evidence that it was losing market share because consumers increasingly preferred beverages without artificial flavoring and chemical preservatives, The Coca-Cola

Company, owner of the brand, responded, not by providing consumers with what they wanted – a natural and healthy drink – but by deceiving them into thinking that Coca-Cola was natural and healthy when, in fact, it contained artificial flavoring and chemical preservatives.  This choice by The Coca-Cola Company was not just an example of bad corporate citizenship.  It also clearly violated federal and state laws specifically prohibiting the precise kind of misbranding and misleading behavior exhibited by The Coca-Cola Company.

2.      The Coca-Cola Company is the world's largest beverage company.  Its product, Coca-Cola,[1] is the world's most popular soft drink and is one of the most well-known and trusted brand names in the world.  Sales of Coca-Cola, however, are fueled by false and deceptive representations that Coca-Cola is not only a healthy product, but one free of artificial flavoring and chemical preservatives.  Every container of Coca-Cola sold in the United States either falsely states that it does not contain artificial flavoring and chemical preservatives, or fails to affirmatively state – as required by state and federal law – that it, in fact, contains both artificial flavoring and chemical preservatives.

3.      Advertisements containing the "Coca-Cola" brand name are ubiquitous throughout the country.  There are few places in the United States where it is not prominently displayed on billboards, television and radio advertisements, and in-store displays.  Defendants leverage this brand name to sell millions of containers of Coca-Cola.  Through their advertising efforts, Defendants portray Coca-Cola as an all-American product.  They also falsely portray Coca-Cola as a healthy and all-natural product.

4.      Indeed, The Coca-Cola Company's own website directs consumers to the website of

---

[1]      For the avoidance of any confusion, by "Coca-Cola," Plaintiffs mean that specific soft drink that is commonly sold by Defendants in red cans or bottles containing red labels, and that is sometimes referred to by Defendants as the "original formula."  As used herein, the term "Coca-Cola" is not meant to include any distinct soft drinks that may have similar names, such as Diet Coke, Cherry Coke, or Caffeine Free Coca-Cola.

The Coca-Cola Company Beverage Institute for Health & Wellness, which portrays Defendants' products, including Coca-Cola, as an integral part of a healthy diet and an excellent means of maintaining proper hydration. The website specifically states that: "Global in scope, the Beverage Institute for Health & Wellness (BIHW) is part of The Coca-Cola Company's ongoing commitment to use evidence-based science to advance knowledge and understanding of beverages, beverage ingredients, and the important role that active healthy lifestyles play in supporting health and wellbeing." *See* http://beverageinstitute.org/us/about-us/.

5.      It goes so far as to recommend that Defendants' products, including Coca-Cola, should specifically be used to maintain the health and well-being of children. It states: "Studies suggest that active children consume more fluids and stay better hydrated when the liquid is flavored. Beverages that are sweetened with caloric sweeteners or with low- and no-calorie sweeteners can be an important contributor to hydration, providing a sweet taste that encourages a child to consume more fluid." *See* http://beverageinstitute.org/us/article/special-considerations-for-children/.

6.      Defendants' concerted efforts to employ false and deceptive labeling practices to mislead consumers into thinking Coca-Cola is natural and healthy, when in fact it is neither, did not occur by accident. Rather, it was a response to changing consumer preferences, which were causing Coca-Cola, as well as other carbonated soft drinks, to lose market share.

7.      By 2008, Defendants realized they had a significant problem. Sales of carbonated sodas were precipitously dropping and reached their lowest levels since 1997. *See* Jessica Wohl, *U.S. Soft-Drink Volume Decline Steepest in Decades*, Reuters, Mar. 30, 2009.

8.      Worse still, consumers were not only buying and drinking less soda, they were switching to other beverages entirely. Studies showed that because soda was associated with empty calories and artificial ingredients, consumers were fundamentally changing their drinking habits.

One leading study showed that, between 2003 and 2008, the regular carbonated soft drink market lost 15.6 million adult drinkers.   Marketing research showed that consumers were increasingly interested in all natural foods that did not contain chemical preservatives or artificial flavors.  *See Classic Soft Drinks Fall Out of Favor*, Mar. 30, 2009 (available at http://www.mintel.com/press-centre/food-and-drink/classic-soft-drinks-fall-out-of-favor).

9.      These developments were a major concern for Defendants because their beverage business, and their flagship Coca-Cola brand, contained chemical preservatives and artificial flavorings.

10.      Defendants were aware that sales were declining because, as established by consumer surveys, an overwhelming majority of consumers correctly and accurately perceived their products to be unnatural, artificial and chemically preserved.  This critical fact was compounded as competitors like Pepsi and Red Bull began introducing new cola products that were being touted as "all natural" or "100% natural," and which lacked certain artificial ingredients, like the phosphoric acid that Defendants used to artificially flavor and chemically preserve their Coca-Cola products.

11.      The situation so substantially affected Defendants that The Coca-Cola Company's Chief Marketing and Commercial Officer referred to these changes in consumer preferences as a "category five" hurricane that was "really bearing down on us."  *See* FD (Fair Disclosure) Wire, *The Coca Cola Company Analyst Meeting Day 1*, Nov. 16, 2009.  He went on to note that: "That is not a fad.  Consumers who classify themselves as LOHAS [Lifestyles of Health and Sustainability] or those who value natural ingredients represent in some markets 35% of the total market." *Id*.

**The Pemberton Campaign**

12.      Rather than reformulate Coca-Cola and their other soft drinks to appeal to these changing consumer preferences for natural and healthy beverages, Defendants adopted a global campaign of disinformation, false advertising, false labeling and misbranding that was dubbed

"Pemberton" after the pharmacist who invented Coca-Cola.  This campaign was designed to fool consumers into the erroneous belief that their products were not artificially flavored or chemically preserved.  In so doing, they not only misled and deceived consumers but, as described below, broke a number of federal and state food labeling laws designed to protect consumers from such illegal and deceptive practices.

13.    The main goal of the Pemberton campaign was, as admitted at the time by the Global Brand Director of Coca-Cola, to falsely represent to consumers that Coca-Cola never had, and never would, add chemical preservatives or artificial flavorings.  "'Pemberton' is more fact-based, affirming for consumers that Coca-Cola never has had, and never will have, added preservatives or artificial flavors."  *See* Coke Campaign Focuses on What's Not in the Can; 'No Added Preservatives or Artificial Flavors,' *New York Times*, Aug. 6, 2008.

14.    As part of the campaign, Defendants placed false statements on product labels on, for example, two-liter bottles and 12-pack and 24-pack cartons of cans of Coca-Cola that affirmatively misrepresented: "no artificial flavors.  no preservatives added.  since 1886."  This statement, as well as the entire premise of the Pemberton campaign, was false and misleading.

15.    In fact, Coca-Cola contains phosphoric acid.  Phosphoric acid is both an artificial flavoring and a chemical preservative.

16.    Also false was the prominent representation on Coca-Cola containers and advertisements that Coca-Cola is still made with the "original formula" devised by Pemberton in 1886.  In fact, the composition of Coca-Cola has repeatedly changed over time.  These changes have included, among other things, an increase in the amount of unhealthy ingredients like sugar and corn syrup and the addition of artificial ingredients like phosphoric acid.  *See Coca-Cola Bottling Co. of Shreveport, Inc. v. The Coca-Cola Co.*, 563 F. Supp. 1122, 1131 (D. Del. 1983).

17.    Ignoring the falsity of their statements and labeling, Defendants conceded that

AMENDED CLASS ACTION COMPLAINT
Case Number:  4:14-MD-02555-JSW

Pemberton was designed to deceive consumers by misrepresenting that Coca-Cola does not use chemical preservatives or artificial flavorings.  According to one of Defendants' marketing directors: "When we talked to consumers about Coke, we realized they did not know that it has no added preservatives or artificial flavors.  We felt it was important to reassure Coke drinkers of this fact."  *See* Coke Campaign Focuses on What's Not in the Can; 'No Added Preservatives or Artificial Flavors,' *New York Times*, Aug. 6, 2008.

18.     Similarly, a regional marketing director for a Coca-Cola entity was quoted as saying: "Our research has highlighted that there is a need and an opportunity to remind consumers that Coca-Cola is the 'real thing.'  The Pemberton campaign is simply about letting consumers know that the formula for Coca-Cola has not changed for more than 120 years."  *See* Coca-Cola: New and Improved? Nope, Still the Same, *Marketing Magazine*, Sept. 5, 2008.

19.     The Coca-Cola Company's own CFO, Gary Fayard, made the following statement at a consumer conference held on September 3, 2008:

> North America, it's the one last market we really need to turnaround.   We acknowledge it but we've got some very good plans to do that.  We think we know what we need to do.  We needed to fix our marketing and we think we've done that.  We've got very good marketing in the US now.  We've started what we call Project Pemberton.  This is about sparkling beverages. It will be print. You'll see it soon. It will be print but it's actually re-educating the consumer, and I don't know that you can read what it says there but it says "No preservatives added, no artificial flavors since 1886.  Never has, never will".  And if you think about the new teenagers today and young adults as they've grown up and there's just an explosion of choices they didn't grow up with their limited choices like I did and maybe they've forgotten that Coke actually was born in 1886 and there weren't artificial ingredients back then.  This is all pretty natural stuff and we're just -- to remind people.

*See* The Coca-Cola Company at Lehman Brothers Back-to-School Consumer Conference, *FD (Fair Disclosure) Wire*, Sept. 3, 2008.

20.     Additionally, Defendants concealed the fact that their Coca-Cola products contained artificial flavors and chemical preservatives by failing to make legally mandated labeling

disclosures detailing  the function of ingredients like phosphoric acid that are used as artificial flavorings and chemical preservatives in those products.

21.     Under both federal and Massachusetts law, Defendants are required to disclose the presence of artificial flavoring and chemical preservatives in food products.

22.     Defendants are also required to clearly state the function of any ingredient that is used as either an artificial flavoring or a chemical preservative.

23.     Nowhere on any Coca-Cola product does the label identify the function of phosphoric acid.

24.     Nowhere on any Coca-Cola product does the label state that the product contains artificial flavoring or chemical preservatives.

25.     In fact, many containers of Coca-Cola affirmatively state that they do not contain any artificial flavoring or chemical preservatives.

26.     Such false statements and omissions violate federal and Massachusetts law and render these products illegally misbranded.

27.     These products cannot be lawfully manufactured, distributed, or sold to consumers.

28.     The Food, Drug & Cosmetic Act ("FDCA") and regulations promulgated thereunder bar food manufacturers and distributors like Defendants from selling misbranded and illegal products that contain labels that fail to accurately disclose the nature of their contents.

29.     Under federal and Massachusetts law, products such as Coca-Cola are "misbranded" if their "labeling is false or misleading in any particular" or if they do not contain certain information on its labeling.  *See* 21 U.S.C. §§ 343(a), (f) and (k); Massachusetts ALM GL ch. 94 § 187.

30.     Coca-Cola products are misbranded under federal and Massachusetts law because they fail to disclose on their labeling that they contain artificial flavors or chemical preservatives.

*See* 21 U.S.C. § 343(k); Massachusetts ALM GL ch. 94 § 187.

31.     Massachusetts requires that all packaged food be labeled in compliance with applicable law including all labeling requirements contained in 21 C.F.R. Part 101 - Food Labeling. 105 CMR 590.001; 105 CMR 590.004(B); and Massachusetts Food Code § 3-201.11. Massachusetts does this "to safeguard public health and provide to consumers food that is safe, unadulterated, and honestly presented." 105 CMR 590.001; 105 CMR 590.002; Massachusetts Food Code § 3-101.11.  Massachusetts mandates that "[f]ood shall be safe, unadulterated, and, as specified under [FC] § 3-601.12, honestly presented."  Massachusetts Food Code § 3-101.11; 105 CMR 590.001.  Massachusetts Food Code § 3-601.12 provides that "[f]ood shall be offered for human consumption in a way that does not mislead or misinform the consumer."  Massachusetts Food Code § 3-601.12; 105 CMR 590.001.

32.     Pursuant to Massachusetts 105 CMR 570.012 "[a]ll bottled water and carbonated non-alcoholic beverages shall comply with applicable requirements of the federal Food Labeling regulations, 21 CFR Part 101."

33.     Under both federal and Massachusetts law it is illegal to manufacture, deliver or sell misbranded food.  *See* 21 U.S.C. § 331; Massachusetts ALM GL ch. 94 § 190.

34.     Because the manufacture and sale of Coca-Cola violates the food labeling laws of Massachusetts, the actions of Defendants also constitute predicate acts under consumer protection laws of Massachusetts, including Massachusetts ALM GL ch. 93A *et seq.*

35.     Defendants are major international food manufacturers and are well aware of the requirements of federal and state laws.  Yet, they have chosen to ignore those laws in order to increase sales and profits at the expense of consumers, including Plaintiff.

36.     In order to conceal from consumers (including Plaintiffs) that Coca-Cola and other soft drinks include artificial flavorings and chemical preservatives, Defendants have knowingly and

intentionally failed to disclose their existence in Coca-Cola products.

37.     Plaintiff, individually, and on behalf of other consumers who purchased Coca-Cola, now bring this action, not only to recover damages, but to stop Defendants from continuing to engage in such unlawful actions.

## PARTIES

38.     Plaintiff Marino is a resident of Chelmsford, Massachusetts.

39.     Plaintiff Marino purchased Coca-Cola in Massachusetts within the four years preceding the filing of this action (the "Class Period").

40.     Plaintiff DiPaola is a resident of Boston, Massachusetts.

41.     Plaintiff DiPaola purchased Coca-Cola in Massachusetts within the four years preceding the filing of this action.

42.     Upon information and belief, defendant The Coca-Cola Company is a Delaware corporation, with its principal place of business at One Coca-Cola Plaza, Atlanta, Georgia.

43.     Upon information and belief, defendant Coca-Cola Refreshments USA, Inc. is a Delaware corporation with its principal place of business at One Coca-Cola Plaza, Atlanta, Georgia.

44.     Upon information and belief, defendant Coca-Cola Refreshments USA, Inc. is The Coca-Cola Company's bottling and customer service organization for North America.

45.     Coca-Cola Refreshments USA, Inc. manufactures, distributes, and sells approximately 88 percent of The Coca-Cola Company's unit case volume in the United States.  Upon information and belief, this includes Coca-Cola.

## JURISDICTION AND VENUE

46.     This Court has jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which: (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (2) members of the class of Plaintiffs are citizens of a

State different from a defendant; and (3) the number of members of all proposed Plaintiff classes in the aggregate is greater than 100.

47.     The Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged herein occurred in Massachusetts.  Defendants also have sufficient minimum contacts with Massachusetts and have otherwise intentionally availed themselves of the markets in Massachusetts through the promotion, marketing, and sale of products sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. As a result of regularly conducting business, marketing, distributing, promoting and/or selling products—including Coca-Cola—throughout the State of Massachusetts, Defendants obtained the benefits of the laws of Massachusetts and profited from Massachusetts commerce.

48.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to these claims occurred in this District, a substantial part of the property that is the subject of this action is situated in this District, and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## FACTS RELEVANT TO ALL CLAIMS

### Coca-Cola products are misbranded and illegal

49.     All containers of Coca-Cola sold in the United States are misbranded and illegal.

50.     Defendants knowingly and intentionally sold these misbranded products to consumers (including Plaintiffs) with the intent to deceive.

51.     Plaintiff Marino purchased Coca-Cola in Chelmsford, Massachusetts within the past four years.  In particular, she purchased Coca-Cola as an occasional treat for her three young daughters, believing that the product did not contain any artificial flavorings or chemical

preservatives, and unaware that Coca-Cola contained phosphoric acid.  Upon learning this information, Ms. Marino stopped purchasing Coca-Cola for her children.

52.     Plaintiff DiPaola purchased Coca-Cola in Boston, Massachusetts within the past four years.  He purchased the product for himself and drank it regularly, believing it to be a natural and healthy beverage.  However, he stopped purchasing and drinking Coca-Cola when he learned that it contains artificial flavorings and chemical preservatives, including phosphoric acid.

53.     All containers of Coca-Cola fail to state that any Coca-Cola ingredients are used as artificial flavoring or as a chemical preservative.

54.     Labels on 2 liter bottles, 24-packs of 12 ounce cans, and 12-packs of 12 ounce cans of Coca-Cola state, "no artificial flavors.  no preservatives added.  since 1886."

55.     Plaintiffs' purchases of Coca-Cola in Massachusetts included 2 liter bottles that: 1) included the false affirmative statement that Coca-Cola contains no artificial flavors or preservatives; 2) failed to disclose the function of phosphoric acid as a chemical preservative and artificial flavor; and 3) falsely represented that Coca-Cola was manufactured according to the original formula.  In particular, Plaintiffs Marino and DiPaola each purchased 2 liter bottles that stated on the labels: "no artificial flavors.  no preservatives added.  since 1886." and "original formula."

56.     The ingredients in Coca-Cola include phosphoric acid, which is both an artificial flavoring and a chemical preservative.

**Phosphoric acid is an artificial flavoring**

57.     Phosphoric acid is an artificial flavoring.

58.     It has a characteristic tart taste that is imparted into Coca-Cola.

59.     The Coca-Cola Company's own website (http://productnutrition.thecoca-colacompany.com/ingredients) previously stated: "Phosphoric acid is a used in certain soft drinks, including Coca-Cola, to add tartness to the beverage."

60.     It also discussed acidulants such as phosphoric acid and stated that acidulants are: "Acids, which include phosphoric acid and citric acid, and acidic salts help to provide flavoring. They are responsible for the tart taste which helps to balance the sweetness.  They also help to reduce the growth of microorganisms (i.e., protect the food from spoiling)."

61.     Today, those same statements have been moved to the website of The Coca-Cola Company Beverage Institute for Health & Wellness.  *See* http://beverageinstitute.org/us/beverage-ingredient-glossary/.

62.     These statements were also present on The Coca-Cola Company's website located at www.cocacolaambassadors.com.

63.     In a publication entitled "What is in Coca-Cola? A briefing on our ingredients," Defendants explicitly state that phosphoric acid "is used to add a tangy taste to some colas."  *See* http://conoce.cocacola.es/img/comunicacioncientifica/docu_ingredientes_ing.pdf.

64.     Further, the American Beverage Association website defines "Phosphoric Acid" in the following manner: "This flavoring agent in soft drinks is a preservative that provides tartness." *See* http://www.ameribev.org/resources/beverage-industry-terms/.

65.     The board of directors of the American Beverage Association (which is a leading trade association for soda manufacturers) is chaired by an officer of a Coca-Cola entity.

66.     Seven officers of The Coca-Cola Company or affiliated entities are board members of the American Beverage Association.

67.     21 C.F.R. § 101.22(a)(1) provides that, "[t]he term *artificial flavor* or *artificial flavoring* means any substance, the function of which is to impart flavor, which is not derived from

a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof." 21 C.F.R. § 101.22(a)(1).

68.     Massachusetts 105 CMR 520.122(A)(1) identically provides that, "[t]he term artificial flavor or artificial flavoring means any substance, the function of which is to impart flavor, which is not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof."  105 CMR 520.122(A)(1).

69.     Similarly, the Coca-Cola Company's website defines "artificial flavors" as "substances used to impart flavor that are not derived from a natural substance such as a spice, fruit or fruit juice, vegetables or herbs."  *See* http://beverageinstitute.org/us/beverage-ingredient-glossary/.

70.     The function of phosphoric acid in Coca-Cola, in part, is to impart flavor.

71.     Phosphoric acid is not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof.

72.     Therefore, phosphoric acid is an artificial flavoring under 21 C.F.R. § 101.22(a)(1) and 105 CMR 520.122(A)(1).

73.     Phosphoric acid also meets Defendants' own definition of "artificial flavor."

74.     Phosphoric acid also does not meet the criteria to be a natural flavoring.

75.     21 C.F.R. § 101.22(a)(3) provides that, "[t]he term *natural flavor* or *natural flavoring* means the essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf

or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof, whose significant function in food is flavoring rather than nutritional."  21 C.F.R. § 101.22(a)(3).

76.     Massachusetts 105 CMR 520.122(A)(3) identically provides that, "[t]he term natural flavor or natural flavoring means the essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit, or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof, whose significant function in food is flavoring rather than nutritional."  105 CMR 520.122(A)(3).

77.     Similarly, the website of Defendants or affiliated entities defines "natural flavors" as follows: "Natural flavors are derived from the essential oils or extracts of spices, fruits, vegetables and herbs."  *See* http://beverageinstitute.org/us/beverage-ingredient-glossary/.

78.     Phosphoric acid is not an essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof.

79.     Therefore, phosphoric acid is not a "natural flavor," as defined in 21 C.F.R. § 101.22(a)(3) or 105 CMR 520.122(A)(3).

80.     Nor does phosphoric acid meet the Defendants' own definition of a natural flavor.

81.     FDA considers phosphoric acid to be an artificial flavoring.

82.     In the 1975 Select Committee on GRAS Substances ("SCOGS") Report on phosphates, phosphoric acid is described as follows:

-14-

Phosphoric acid, $H_3PO_4$, is used in the commercial production of polyphosphates, metaphosphates, and other orthophosphates. They serve as acidulants, sequestrants, and flavoring agents in nonalcoholic beverages.

83.     After the SCOGS review, in 1979, FDA published a proposed rule explicitly stating that phosphoric acid is used as a "flavoring agent," as that term is defined in 21 C.F.R. § 170.3(o)(12).  *See* 44 Fed. Reg. 74845, 74854 (Dec. 18, 1979).

84.     The proposed rule intended to formally identify phosphoric acid as "Generally Recognized as Safe" or "GRAS" for use as a flavoring agent.  *See* 44 Fed. Reg. at 74854.

85.     However, together with about eighty other pending proposals, the proposed rule was withdrawn – not because FDA no longer considered phosphoric acid to be GRAS or a flavoring agent – but because FDA determined "that the backlog of pending proposals dilutes its ability to concentrate on higher priority regulations that are mandated by statute or are necessary to address current public health issues.  Because of the agency's limited resources and changing priorities, FDA has been unable to: (1) Consider, in a timely manner, the issues raised by the comments on these proposals and (2) complete the action on them."  *See* 69 Fed. Reg. 68831-01, 68832 (Nov. 26, 2004).

86.     In addition, FDA commissioned "A Comprehensive Survey of Industry on the Use of Food Chemicals Generally Recognized as Safe" (September 1972) ("GRAS Report"). The GRAS Report is incorporated into 21 C.F.R. § 170.3(o).

87.     The GRAS Report expressly states that phosphoric acid is a GRAS substance with technical functions that include use as a "flavoring agent."  *See* GRAS Report Table 6 at 20.

88.     The GRAS Report shows that twenty-three food manufacturers identified phosphoric acid as being used in their products as a flavoring agent.  *Id.*

89.     Phosphoric acid is listed on an FDA recognized list of GRAS flavoring substances published by the Flavor and Manufacturers Association ("FEMA").

-15-

90.     Phosphoric acid is specifically listed in FEMA GRAS List III, which was published in the scientific journal, *Food Technology*, Vol. 19, No. 2.  FDA has specifically recognized FEMA GRAS List III as reliable. *See* 44 Fed. Reg. 71460, 71461 (Dec. 11, 1979).

91.     Defendants are well-aware of this GRAS list.  The Coca-Cola Company is a leading member of FEMA.

92.     A representative of The Coca-Cola Company presently sits on FEMA's board of governors.  *See* http://www.femaflavor.org/officersgovernors.  A representative of The Coca-Cola Company has served as FEMA's president on multiple occasions, including as recently as 2012. *See* http://www.femaflavor.org/past-fema-presidents.

93.     The Federal Register also states that "Phosphoric acid has many uses including an acidulate and flavor in beverages of the soft drink type."  62 Fed. Reg. 48837-01, 48841 (Sept. 17, 1997).

**Phosphoric acid is a chemical preservative**

94.     Phosphoric acid is a chemical preservative.

95.     21 C.F.R. § 101.22(a)(5) provides that, "[t]he term *chemical preservative* means any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties."  21 C.F.R. § 101.22(a)(5).

96.     Massachusetts 105 CMR 520.122(A)(5) identically provides that, "[t]he term chemical preservative means any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties."  105 CMR 520.122(A)(5).

97.     Phosphoric acid is not a common salt, sugar, vinegar, spice, or oil extracted from spices, nor is it a substance added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties.

98.     As used in Coca-Cola, phosphoric acid prevents or retards deterioration of the product.

99.     The Coca-Cola Company's website describes phosphoric acid as having a preservative effect.  It discusses acidulants such as phosphoric acid and states that acidulants are: "Acids, which include phosphoric acid and citric acid, and acidic salts help to provide flavoring. They are responsible for the tart taste which helps to balance the sweetness.  They also help to reduce the growth of microorganisms (i.e., protect the food from spoiling)."  *See* http://beverageinstitute.org/us/beverage-ingredient-glossary/.

100.    The website of American Beverage Association defines Phosphoric Acid in the following manner: "This flavoring agent in soft drinks is a preservative that provides tartness."  *See* http://www.ameribev.org/resources/beverage-industry-terms/.

101.    Coca-Cola bottlers have submitted expert testimony in legal proceedings where the expert testified that phosphoric acid acts as a preservative in Coca-Cola.

102.    Phosphoric acid is a "chemical preservative," as defined in 21 C.F.R. § 101.22(a)(5) and 105 CMR 520.122(A)(5).

103.    FDA considers phosphoric acid to be a preservative.

104.    FDA also states that such acidulants are used as part of the "acidification" process, "[a] technology used by processors to preserve foods by adding acids and rendering food safe from harmful bacteria." *See* http://www.fda.gov/food/foodscienceresearch/toolsmaterials/ucm215830.htm.  Also "[a]cidification is one way to maintain safe pH levels and keep various foods safe from harmful bacteria." *Id*.

105.    FDA also states that an "inherent control for biological hazards" in carbonated soft drinks is the "[c]ombination of low pH, high carbon dioxide level and the antimicrobial activity of acids such as phosphoric acid." *See* http://www.fda.gov/downloads/food/foodscienceresearch/ucm334110.pdf  at 39.

106.    FDA has also stated that phosphoric acid is a "common acidulent[]" found in "cola soda." *See* http://www.fda.gov/food/foodscienceresearch/toolsmaterials/ucm215830.htm.

107.    The 1979 proposed rule stated that phosphoric acid is used as a pH control agent. *See* 44 Fed. Reg. 74845, 74854 (Dec. 18, 1979).   A chemical acting as a pH control agent is a type of chemical preservative.

108.    The GRAS Report also states that technical functions of phosphoric acid include use as a pH control agent. *See* GRAS Report Table 6 at 20.

**Coca-Cola products are misbranded and illegal**

109.    Because Coca-Cola contains artificial flavoring and chemical preservatives, Coca-Cola product labels are required to state the presence of such artificial flavoring and chemical preservatives and must specifically identify the function of phosphoric acid, as used in Coca-Cola.

110.    21 C.F.R. § 101.22(c) provides that "[a] statement of artificial flavoring, artificial coloring, or chemical preservative shall be placed on the food or on its container or wrapper, or on any two or all three of these, as may be necessary to render such statement likely to be read by the ordinary person under customary conditions of purchase and use of such food."

111.    105 CMR 520.122(C) identically provides that "[a] statement of artificial flavoring, artificial coloring, or chemical preservative shall be placed on the food, or on its container or wrapper, or on any two or all of these, as may be necessary to render such statement likely to be read by the ordinary individual under customary conditions of purchase and use of such food."

112.    21 C.F.R. § 101.22(j) provides that "[a] food to which a chemical preservative(s) is added shall . . . bear a label declaration stating both the common or usual name of the ingredient(s) and a separate description of its function, e.g., 'preservative', 'to retard spoilage', 'a mold inhibitor', 'to help protect flavor' or 'to promote color retention.'"

113.    105 CMR 520.122(J) identically provides that "[a] food to which a chemical preservative(s) is added shall . . . bear a label declaration stating both the common or usual name of the ingredient(s) and a separate description of its function, e.g., 'preservative,' 'to retard spoilage,' 'a mold inhibitor,' 'to help protect flavor' or 'to promote color retention.'"

114.    Containers of Coca-Cola do not have a statement that they contain artificial flavoring.

115.    Containers of Coca-Cola do not have a statement that they contain chemical preservatives.

116.    Containers of Coca-Cola do not specify the function of phosphoric acid, as used in the product.

117.    Because Coca-Cola containers do not have labels with statements that they contain artificial flavoring or chemical preservatives, they are misbranded under the FDCA and Massachusetts food labeling law.

118.    Because Coca-Cola containers do not have labels with statements that the function of phosphoric acid therein is as an artificial flavor or chemical preservative, they are misbranded under the FDCA and the food labeling laws of Massachusetts.

119.    Certain Coca-Cola containers (2-liter bottles, 24-packs of 12 ounce cans, and 12-packs of 12 ounce cans) also contain the affirmative statement that there are "no artificial flavors. no preservatives added."

120.    This statement is false.

121.    Defendants knowingly and intentionally failed to include statements on containers of Coca-Coca regarding the presence of artificial flavoring and chemical preservatives, despite the fact that Coca-Cola contains artificial flavoring and chemical preservatives.

122.    Defendants knowingly, intentionally, and falsely affirmatively stated that Coca-Cola has "no artificial flavors.  no preservatives added," despite the fact that Coca-Cola contains artificial flavoring and chemical preservatives.

123.    Because these Coca-Cola containers falsely represent that they contain no artificial flavors or preservatives, they are misbranded under both the FDCA and the labeling laws of Massachusetts.

124.    Defendants have violated the requirements of 21 C.F.R. § 101.22, 21 U.S.C. § 343(a), 21 U.S.C. § 343(f) and 21 U.S.C. § 343(k).

125.    As a result of their violations of 21 C.F.R. § 101.22, Defendants also violated Massachusetts 105 CMR 570.012 because, pursuant to Massachusetts 105 CMR 570.012, "[a]ll bottled water and carbonated non-alcoholic beverages shall comply with applicable requirements of the federal Food Labeling regulations, 21 CFR Part 101."  Violations of federal labeling requirements also result in violations of 105 CMR 590.001; 105 CMR 590.004(B); and Massachusetts Food Code § 3-201.11, which mandate that packaged food comply with all applicable laws.

126.    Defendants have also violated 21 C.F.R. § 1.21 by, *inter alia*, failing to reveal material facts on the labels of Coca-Cola containers.

127.    Defendants have violated the requirements of Massachusetts ALM GL ch. 94 § 187; ALM GL ch. 94 § 190; 105 CMR 590.001; 105 CMR 590.002; 105 CMR 590.004(B); 105 CMR 520.122; Massachusetts Food Code § 3-101.11; Massachusetts Food Code § 3-201.11; and Massachusetts Food Code § 3-601.12.

128.    Defendants are aware of these statutes and regulations, as evidenced by the labels of their other products.

129.    For example, the ingredient list on the label of Defendants' Minute Maid Pomegranate Blueberry Flavored Blend of 5 Juices states that it contains citric acid and that the citric acid's technical function is that it "provides tartness."

130.    This statement of citric acid's technical function was included on the label in an effort to comply with 21 C.F.R. § 101.22 and 105 CMR 520.122.

131.    There is no other reason why this label would say that the citric acid's technical function is to "provide[] tartness."

132.    Defendants have also violated Massachusetts 105 CMR 520.122 because Coca-Cola products bear or contain artificial flavoring, artificial coloring, or chemical preservatives without labeling stating that fact.

133.    Defendants have violated Massachusetts ALM GL ch. 94 § 187 and ALM GL ch. 94 § 190, which make it unlawful to manufacture, sell, deliver, or offer to deliver any misbranded food.

134.    Defendants have violated Massachusetts ALM GL ch. 94, § 187, 190, and 105 CMR 520.115 because words, statements, or other information required pursuant to Massachusetts's food labeling laws to appear on the label or labeling are not prominently placed upon the label or labeling with conspicuousness, as compared with other words, statements, designs, or devices in the labeling and in terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

135.    Defendants have violated Massachusetts ALM GL ch. 94 §§ 187, 190; 105 CMR 590.001, 590.122, Massachusetts Food Code §§ 3-101.11; 3-601.12 and because, for all the reasons set forth herein, Coca-Cola labeling is false and misleading in one or more ways, is not honestly

presented and is offered for human consumption in a way that misleads and misinforms the consumer.  Among other things, the labeling is false and misleading because it: fails to identify the presence of chemical preservatives and artificial flavors; affirmatively misrepresents that there are "no artificial flavors"; affirmatively misrepresents that there are "no preservatives added"; and affirmatively misrepresents that there have been "no artificial flavors" and "no preservatives added" "since 1886."  The labeling also falsely states that Coca-Cola is made with the same original formula used "since 1886."

136.    Defendants have violated Massachusetts 105 CMR 520.116, which makes it unlawful to falsely represent food as natural when if it fails to meet Massachusetts' requirements for doing so.  Coca-Cola cannot be represented as natural because the artificial flavors and preservatives it contains are inconsistent with Massachusetts' definition of natural foods.

137.    Pursuant to 105 CMR 520.116(A)(1), (C), it is illegal to sell, advertise, distribute for sale, traffic, trade, transportation, display for sale, offer for sale, deliver for sale, intend to sell any food products as "natural," or with words of similar meaning, unless such food complies with the State off Massachusetts definition of natural food.  Doing so results in the food being misbranded. 105 CMR 520.116(C); ALM GL ch. 94 § 187.  Pursuant to 105 CMR 520.116(A)(2), "'Natural food' means food which in its processing has not been treated with preservatives, antibiotics, synthetic additives, artificial flavoring, artificial coloring, or has been processed in such a manner so that it become significantly less nutritive.  Natural foods may only be processed by extracting, purifying, heating, fermenting, concentrating, dehydrating, cooling, or freezing."

138.    By affirmatively stating that Coca-Cola had no "artificial flavors" and no added preservatives while simultaneously illegally failing to disclose that Coca-Cola contained artificial flavors and chemical preservatives, Defendants violated 105 CMR 520.116 by falsely representing Coca-Cola as natural when it failed to meet Massachusetts' requirements for doing so.

139.    Defendants have a duty to disclose the true nature of the contents of Coca-Cola and failed to abide by that duty.

140.    Significantly, under 21 U.S.C. § 333(a)(1) and the food labeling laws of Massachusetts, Defendants' violations of the FDCA and the food labeling laws of Massachusetts (including all of the aforementioned provisions) are strict liability offenses for which no showing of intent to deceive or defraud is required.

141.    Under both the FDCA and the food labeling laws of Massachusetts, it is a strict liability offense to, *inter alia*, manufacture, sell, deliver, or offer to deliver any food that is misbranded.

142.    By manufacturing and selling misbranded products, Defendants have committed a predicate unlawful act, regardless of any misrepresentation or reliance thereon.

143.    Because Defendants' products are misbranded and illegal, they have a value of zero.

144.    Plaintiffs and other consumers were injured when paying money for a worthless product.

**Purchasers of Misbranded Products Have Been Injured**

145.    Had Plaintiffs known that Coca-Cola was misbranded, Plaintiffs would not have purchased Coca-Cola.

146.    Had Plaintiffs known that Coca-Cola was an illegal product, Plaintiffs would not have purchased Coca-Cola.

147.    Had Plaintiffs known that Coca-Cola violated federal or state laws and regulations, Plaintiffs would not have purchased Coca-Cola.

148.    Plaintiffs did not know that phosphoric acid was a chemical preservative or an artificial flavoring.

149.    Had Plaintiffs known that Coca-Cola contained artificial flavoring, Plaintiffs would not have purchased Coca-Cola.

150.    Had Plaintiffs known that Coca-Cola contained chemical preservatives, Plaintiffs would not have purchased Coca-Cola.

151.    Because Coca-Cola products are illegal and misbranded, they are economically worthless.

152.    Because Coca-Cola products are illegal and misbranded, they cannot be lawfully resold.

153.    Plaintiffs paid money for Coca-Cola products that were worth zero.

154.    Had Plaintiffs known that Coca-Cola was worthless, Plaintiffs would not have purchased Coca-Cola.

155.    Had Plaintiffs known that Coca-Cola could not be lawfully sold, Plaintiffs would not have purchased Coca-Cola.

156.    Had Plaintiffs known that Coca-Cola could not be lawfully resold, Plaintiffs would not have purchased Coca-Cola.

157.    Plaintiffs could have purchased cheaper alternative products that were not illegal, misbranded, or worthless.

158.    Plaintiffs paid an unwarranted premium for Coca-Cola over cheaper alternative products that were not illegal, misbranded, or worthless.

159.    Plaintiffs relied on the Coca-Cola labels to Plaintiff's detriment.

160.    Plaintiff's reliance was reasonable.

161.     A reasonable consumer would have been misled by the Defendants' actions.

162.    As a result of Defendants' unlawful misrepresentations, Plaintiffs and millions of others in Massachusetts and throughout the United States purchased Coca-Cola.

163.    Plaintiffs and millions of others in Massachusetts and throughout the United States who purchased Coca-Cola were injured as a result of Defendants' actions.

164.    Plaintiffs and other purchasers of Coca-Cola paid money for products that were worth zero.

165.    Plaintiffs and other purchasers of Coca-Cola paid money for products that were of a lesser value than represented by Defendants.

166.    Plaintiffs and other purchasers of Coca-Cola also paid an unwarranted premium above alternative products that were not illegal, misbranded, or worthless.

167.    Pursuant to Massachusetts ALM GL ch. 93A, on August 19, 2014, a written demand for relief, identifying the Plaintiffs and the Class and reasonably describing the unfair or deceptive acts or practices relied upon and the injury suffered by Plaintiffs and the Class, was mailed and delivered to each Defendant.

## CLASS ACTION ALLEGATIONS

168.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following class (the "Class"):

> 1) All persons in Massachusetts who purchased Coca-Cola on or after August 1, 2010.

169.    Plaintiffs seek to represent the members of the Class who purchased Coca-Cola in Massachusetts.

170.    The following persons are expressly excluded from the Class: (1) Defendants and their subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

171.    This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

172.   **Numerosity:**   Based upon Defendants' publicly available sales data with respect to Coca-Cola, it is estimated that the number of Class members is potentially in the millions, and that joinder of all Class members is impracticable.

173.   **Common Questions Predominate:**   This action involves common questions of law and fact applicable to each Class member that predominate over questions that affect only individual Class members.   Thus, proof of a common set of facts will establish the right of each Class member to recover.   Questions of law and fact common to each Class member include, for example:

a.   Whether Defendants engaged in unfair, unlawful or deceptive business practices by failing to properly package and label Coca-Cola sold to consumers;

b.   Whether the food products at issue were misbranded or unlawfully packaged and labeled as a matter of law;

c.   Whether Defendants made unlawful and misleading claims regarding artificial flavoring and chemical preservatives in Coca-Cola;

d.   Whether Defendants unlawfully sold misbranded products in violation of the FDCA and the food labeling laws of Massachusetts;

e.   Whether Defendants violated Massachusetts ALM GL ch. 93 *et seq.*;

f.   Whether Defendants breached express or implied warranties;

g.   Whether Plaintiffs and the Class are entitled to equitable and/or injunctive relief;

h.   Whether Defendants' unlawful, unfair and deceptive practices harmed Plaintiffs and the Class; and

i.   Whether Defendants were unjustly enriched by their deceptive practices.

174.   **Typicality:**   Plaintiffs' claims are typical of the claims of the Class because Plaintiffs bought Defendants' Purchased Products during the Class Period.   Defendants' unlawful, unfair, and fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.   The injuries of each member of the Class were caused directly by Defendants' wrongful conduct.   In addition, the factual

underpinning of Defendants' misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

175. **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Class. Neither Plaintiffs nor Plaintiffs' counsel have any interests that conflict with or are antagonistic to the interests of the Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent Plaintiffs' interests and those of the members of the Class. Plaintiffs and Plaintiffs' counsel have the necessary resources to adequately and vigorously litigate this class action, and Plaintiffs and Plaintiffs' counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

176. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class members' rights and the disposition of their interests through actions to which they are not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would create. Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class treatment of common questions of law and fact would also be superior to multiple individual

actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

177.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate injunctive or equitable relief with respect to the Class as a whole.

178.    The prerequisites to maintaining a class action pursuant to Fed. R. Civ. P. 23(b)(3) are met as questions of law or fact common to Class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

179.    Plaintiffs and Plaintiffs' counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

180.    Plaintiffs are members of the Class Plaintiffs seek to represent. Plaintiffs' claims are typical of the Class members' claims. Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' claims are typical and representative of the Class.

181.    There are no unique defenses which may be asserted against Plaintiffs individually, as distinguished from the Class. The claims of Plaintiffs are the same as those of the Class.

182.    No conflicts of interest exist between Plaintiffs and the other Class members. Plaintiffs have retained counsel that is competent and experienced in complex class action litigation. Plaintiffs and Plaintiffs' counsel will fairly and adequately represent and protect the interests of the Class.

1    183.    This class action is superior to any other method for the fair and efficient

2    adjudication of this dispute.

3

4                              **CAUSES OF ACTION**

5                          **FIRST CAUSE OF ACTION**
                    **(Violation of Massachusetts ALM GL ch. 93A *et seq.*)**

6

7    184.    Plaintiffs repeat and reallege each of the above allegations as if fully set forth

8    herein.

9    185.    Defendants' conduct constitutes unfair methods of competition and unfair and

10   deceptive acts and practices in the conduct of a trade or commerce.  Defendants' conduct was

11   consumer-oriented and this conduct had broad impact on consumers at large.  Defendants

12   engaged in false, misleading, and unlawful advertising, marketing, and labeling of Coca-Cola.

13   Defendants' manufacturing, distribution, and sale of Coca-Cola were similarly unlawful.

14

15   186.    Defendants unlawfully sold Coca-Cola in Massachusetts during the past four

16   years.

17   187.    By advertising, marketing, distributing, and selling mislabeled and misbranded

18   Coca-Cola to Plaintiffs and other members of the Class who purchased Coca-Cola in

19   Massachusetts, Defendants engaged in, and continue to engage in, unlawful and deceptive acts

20   and practices.  Defendants' misleading marketing, advertising, packaging, and labeling of Coca-

21   Cola were likely to deceive reasonable consumers.

22

23   188.    Plaintiffs and other members of the Class who purchased Coca-Cola in

24   Massachusetts were deceived.

25   189.    Defendants have engaged in unlawful and deceptive business acts and practices.

26   190.    Plaintiffs and other members of the Class who purchased Coca-Cola in

27   Massachusetts were injured by Defendants' unlawful and deceptive acts and practices. Plaintiffs

28

and other members of the Class who purchased Coca-Cola in Massachusetts were injured by Defendants' use or employment of methods, acts, and practices declared to be unlawful by section two of Massachusetts ALM GL ch. 93A and any rule or regulation issued thereunder. Defendants' use or employment of the unfair and deceptive acts and practices has caused similar injury to numerous other persons similarly situated who the Plaintiffs will adequately and fairly represent.

191.    Defendants' fraud and deception caused Plaintiffs and other members of the Class to purchase Coca-Cola that they otherwise would not have purchased had they known the true nature of these products.

192.    Plaintiffs and other members of the Class who purchased Coca-Cola in Massachusetts were injured as a result of Defendants' unlawful and deceptive acts and practices.

193.    Plaintiffs and other members of the Class who purchased Coca-Cola in Massachusetts further seek to enjoin such unlawful deceptive acts and practices as described above.  Each of the Class members who purchased Coca-Cola in Massachusetts will be irreparably harmed unless and until the unlawful actions of the Defendants are enjoined, in that Defendants will continue to falsely, misleadingly, and unlawfully conceal the artificial flavors and chemical preservatives contained in Coca-Cola and to illegally manufacture, distribute and sell this illegally labeled, misbranded product in violation of the food and drug laws that prohibit such actions.  Plaintiffs and other members of the Class who purchased Coca-Cola in Massachusetts therefore seek to enjoin the manufacture, distribution or sale of any mislabeled or misbranded Coca-Cola in Massachusetts and further request an order granting them injunctive relief, ordering appropriate corrective advertising, and appropriate disclosures on the labeling in advertising, marketing, and promotion of Coca-Cola in Massachusetts.

194.   Absent such injunctive relief, Defendants will continue to illegally manufacture, distribute and sell mislabeled and misbranded Coca-Cola to the detriment of consumers in the state of Massachusetts.

195.   In violation of the labeling laws of the state of Massachusetts and Massachusetts ALM GL ch. 93A et seq., Defendants sold to Plaintiffs and the members of the Class who purchased Coca-Cola in Massachusetts, products that were not capable of being legally sold or resold, and which had no economic value.

196.   Defendants' violation of Massachusetts ALM GL ch. 93A et seq. is ongoing.

197.   As a direct and proximate cause of Defendants' violation of Massachusetts ALM GL ch. 93A et seq., Plaintiffs and the members of the Class who purchased Coca-Cola in Massachusetts were injured when they paid good money for these illegal and worthless products. Plaintiffs and the members of the Class who purchased Coca-Cola in Massachusetts have been damaged in an amount to be determined at trial.

198.   As a result of Defendants' unlawful business practices, Plaintiffs and the members of the Class who purchased Coca-Cola in Massachusetts, pursuant to Massachusetts ALM GL ch. 93A et seq., are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and to restore to Plaintiffs and the members of the Class who purchased Coca-Cola in Massachusetts any money paid for Coca-Cola.

199.   In addition, Plaintiffs and the members of the Class who purchased Coca-Cola in Massachusetts are entitled to the greater of their actual damages and the statutory amount of $25.

200.   On August 19, 2014, more than thirty days prior to the filing of this action, a written demand for relief, identifying the Plaintiffs and the Class and reasonably describing the unfair or deceptive acts or practices relied upon and the injury suffered by Plaintiffs and the

Class, was mailed and delivered to each Defendant.  The Defendants failed to respond to this demand in any reasonable manner.  The Defendants continue to deny any wrongdoing and have refused to change their practices, stop mislabeling and misbranding their Coca-Cola products and stop manufacturing, advertising, selling, and delivering misbranded Coca-Cola products in Massachusetts.

201.    Defendants' actions were knowing and willful and their failure to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two of Massachusetts ALM GL ch. 93A.

202.    Because Defendants' violation of Massachusetts ALM GL ch. 93A *et seq.* was knowing and willful and Defendants' failure to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two of Massachusetts ALM GL ch. 93A, Plaintiffs and the members of the Class who purchased Coca-Cola in Massachusetts are entitled to recover not less than twice and not more than three times their actual damages and any applicable statutory penalties.

203.    Plaintiffs and the members of the Class are also entitled to attorneys' fees.

**SECOND CAUSE OF ACTION**
**(Violation of Massachusetts ALM GL ch. 94 §§ 187 and 190 and 105 CMR 520.116)**

204.    Plaintiffs repeat and reallege each of the above allegations as if fully set forth herein.

205.    All containers of Coca-Cola are misbranded.

206.    Massachusetts ALM GL ch. 94 § 187 provides, *inter alia*, that: "Food shall be deemed to be misbranded:  1. If its labeling is false or misleading in any particular . . . .  If its container is so made, formed, colored or filled as to be misleading . . . If any word, statement or other information required by or under authority of this chapter to appear on the label or labeling

-32-

is not prominently placed thereon with such conspicuousness, as compared with other words, statements, designs, or devices, in the labeling, and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use [or] . . . . If it bears or contains any artificial flavoring, artificial coloring, or permitted chemical preservative, unless it bears labeling stating that fact."

207.   All labeling of the containers of Coca-Cola is false and misleading in a particular.

208.   All containers of Coca-Cola are made as to be misleading.

209.   All containers of Coca-Cola do not have words, statements, or other information required under the FDCA and the Massachusetts labeling laws.

210.   All containers of Coca-Cola bear or contain artificial flavoring and chemical preservatives without bearing a label stating such facts.

211.   All containers of Coca-Cola are misbranded.

212.   Massachusetts ALM GL ch. 94 § 190 bars the manufacture, sale, delivery, or offer of delivery of misbranded food.

213.   Pursuant to 105 CMR 520.116(A)(1), (C) it is illegal to sell, advertise, distribute for sale, traffic, trade, transportation, display for sale, offer for sale, deliver for sale, intend to sell any food products as "natural," or with words of similar meaning, unless such food complies with the State off Massachusetts definition of natural food.  Doing so results in the food being misbranded. 105 CMR 520.116(C); ALM GL ch. 94 § 187.

214.   By affirmatively stating that Coca-Cola had no "artificial flavors" and no added preservatives while simultaneously illegally failing to disclose that Coca-Cola contained artificial flavors and chemical preservatives, Defendants violated 105 CMR 520.116 by falsely representing Coca-Cola as natural when it failed to meet Massachusetts' requirements for doing so.  As a result Defendant's Coca-Cola products were misbranded.

1    215.    Plaintiffs and the Class purchased misbranded containers of Coca-Cola.

2    216.    Plaintiffs and the Class members would not have purchased Coca-Cola had they

3 been aware that it is illegal to sell, violates state or federal law, is misbranded, is economically

4 worthless, or contained chemical preservatives or artificial flavoring.

5
6    217.    Plaintiffs and the Class members were harmed as a result of the purchase of Coca-

7 Cola and are entitled to damages, including the amounts spent on Coca-Cola and punitive

8 damages.

9                          **THIRD CAUSE OF ACTION**
10              **(Breach of Implied Warranty of Merchantability)**

11   218.    Plaintiffs repeat and reallege each of the above allegations as if fully set forth

12 herein.

13   219.    Under Massachusetts law, goods to be merchantable must at least be such as

14       (a) pass without objection in the trade under the contract description; and

15       (b) in the case of fungible goods, are of fair average quality within the

16            description; and

17
18       (c) are fit for the ordinary purposes for which such goods are used; and

19       (d) run, within the variations permitted by the agreement, of even kind, quality

20            and quantity within each unit and among all units involved; and

21       (e) are adequately contained, packaged, and labeled as the agreement may

22            require; and

23       (f) conform to the promises or affirmations of fact made on the container or label

24            if any.

25 ALM GL ch. 106, § 2-314.  The Defendants' misbranded food products violated the implied

26 warranty of merchantability because as misbranded goods unlawfully labeled in violation of state

27 and federal regulations they were contraband and thus incapable of complying with ALM GL ch.
28

-34-

106, § 2-314(a)-(e).  In addition, because of the false labeling statements the Defendants'

misbranded food products bore with respect to artificial flavors, chemical preservatives and being

formulated using Coca-Cola's original formula, the Defendants' misbranded food products failed

to conform to the promises or affirmations of fact made on the container or label of these

products and thus breached the implied warranty of merchantability.

220.    Implied in the purchase of Coca-Cola by Plaintiffs and the Class is the warranty

that the purchased products are legal and can be lawfully sold or resold and are not contraband.

221.    Implied in the purchase of Coca-Cola by Plaintiffs and the Class is the warranty

that the purchased products are properly labeled and packaged.

222.    Defendants knowingly and intentionally misbranded Coca-Cola products.

223.    Misbranded food products are contraband.

224.    Defendants knew those Coca-Cola products were illegal.

225.    Plaintiffs would not have knowingly purchased products that were illegal,

misbranded, contraband, or unsellable.

226.    Plaintiffs would not have knowingly purchased products that were illegal to sell or

resell.

227.    No reasonable consumer would knowingly purchase products that are illegal,

misbranded, contraband, or unsellable.

228.    No reasonable consumer would purchase products that cannot be legally sold or

resold.

229.    The purchased Coca-Cola products were unfit for the ordinary purpose for which

Plaintiffs and the Class purchased them.

230.    As misbranded products that could not be legally sold or resold, the Coca-Cola

products were not merchantable.

231.    As a result, Plaintiffs and the Class were injured through their purchase of an unsuitable, useless, illegal, misbranded, and unsellable product.

232.    Plaintiffs would not have purchased Coca-Cola products if Plaintiffs knew they failed to conform to the promises and affirmations of fact made on the container or label of these products and thus breached the implied warranty of merchantability.

233.    By reason of the foregoing, Plaintiffs and the Class were damaged in the amount they paid for Coca-Cola products, together with punitive damages.

**FOURTH CAUSE OF ACTION**
**(Breach of Express Warranty)**

234.    Plaintiffs repeat and reallege each of the above allegations as if fully set forth herein.

235.    Defendants engaged in a scheme of offering Coca-Cola for sale to Plaintiffs and members of the Class by way of, *inter alia*, product packaging and labeling, and other promotional materials.

236.    In furtherance of its plan and scheme, Defendants prepared and distributed within Massachusetts and nationwide via product packaging and labeling, and other promotional materials, statements that misleadingly and deceptively represented the composition and nature of Coca-Cola.

237.    Plaintiffs and the Class were the intended targets of such representations.

238.    Plaintiffs and the Class reasonably relied on Defendants' representations.

239.    Defendants' affirmations of fact and/or promises relating to their Coca-Cola products created express written warranties that the products would conform to Defendants' affirmations of fact and/or promises.

240.    Alternatively, Defendants' descriptions of their Coca-Cola products became part of the bases of the bargains, creating express written warranties that the products purchased by

Plaintiffs and the other Class members would conform to Defendants' descriptions and

specifications.

241.    In fact, the Coca-Cola products purchased by Plaintiffs did not so conform.

242.    Defendants expressly warrant on Coca-Cola products that they do not contain

artificial flavors or preservatives.

243.    Coca-Cola products do, in fact, contain artificial flavors and preservatives.

244.    Plaintiffs and members of the Class relied on the false representation that Coca-

Cola products do not contain artificial flavors or preservatives.

245.    Defendants have breached their express warranty.

246.    As a result of the foregoing, Plaintiffs and the other Class members have suffered

damages in that the value of the products they purchased was less than warranted by Defendants.

247.    Plaintiffs assert this cause of action for violations of the laws of Massachusetts

pertaining to express warranties.

248.    Plaintiffs and the Class were injured as a result of Defendants' breach of their

express warranties about Coca-Cola.

249.    Coca-Cola that is misbranded due to the Defendants' disregard of food labeling

regulations enacted for the protection of public health is a thing of danger that, like all

misbranded food, poses a risk to public health.

250.    By reason of the foregoing, Plaintiffs and the Class were damaged in the amount

they paid for Coca-Cola products, together with punitive damages.

## FIFTH CAUSE OF ACTION
### (Negligent Misrepresentation)

251.    Plaintiffs repeat and reallege each of the above allegations as if fully set forth

herein.

252.    Defendants had a duty to disclose the presence of artificial flavoring and chemical

-37-

preservatives in Coca-Cola

253.    In making misrepresentations of fact and omissions of material fact to Plaintiffs and the other Class members about their Coca-Cola products, Defendants failed to fulfill their duties to disclose the material facts alleged above.  Among the direct and proximate causes of said failure to disclose were the negligence and carelessness of Defendants.

254.    Plaintiffs and the other Class members, as a direct and proximate cause of Defendants' breaches of their duties, reasonably relied upon such representations and omissions to their detriment.

255.    By reason of the foregoing, Plaintiffs and the other Class members have suffered damages in an amount to be proved at trial, together with punitive damages.

**SIXTH CAUSE OF ACTION**
**(Negligence)**

256.    Plaintiffs repeat and reallege each of the above allegations as if fully set forth herein.

257.    Defendants negligently made misrepresentations of fact and omissions of material fact to Plaintiffs and the other Class members about their Coca-Cola products.

258.    Defendants failed to label or advertise their Coca-Cola products in a lawful manner and violated their duties to disclose the material facts alleged above.

259.    Plaintiffs and the other Class members, as a direct and proximate cause of Defendants' breaches of their duties, reasonably relied upon such representations to their detriment.

260.    As described above, Defendants' actions violated a number of express statutory provisions designed to protect Plaintiffs and the Class.

261.    Defendants' illegal actions constitute negligence *per se*.

262.    Moreover, the statutory food labeling and misbranding provisions violated by Defendants are strict liability provisions.

263.    By reason of the foregoing, Plaintiffs and the other Class members have suffered damages in an amount to be determined at trial, together with punitive damages.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)

264.    Plaintiffs repeat and reallege each of the above allegations as if fully set forth herein.

265.    As a result of Defendants unlawful and deceptive actions described above, Defendants were enriched at the expense of Plaintiffs and the Class through the payment of the purchase price for Coca-Cola.

266.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received from the Plaintiffs and the Class.

267.    By reason of the foregoing, Plaintiffs and the Class were damaged in the amount they paid for Coca-Cola products, together with punitive damages.

## EIGHTH CAUSE OF ACTION
### (Money Had and Received)

268.    The manufacture, delivery, offer to delivery or sale of a misbranded food product is an illegal act in Massachusetts.  Such practices are expressly prohibited by Massachusetts law.

269.    The sale of a misbranded product violates the public policy of Massachusetts.

270.    The misbranded products purchased by Plaintiffs and the Class were illegal and worthless as a matter of law.

271.    Plaintiffs and members of the Class were unaware that the Coca-Cola products they purchased were misbranded, illegal, and worthless.

272.     Defendants received the money from Plaintiffs and the Class used to purchase Coca-Cola products.

273.     Defendants benefitted from receipt of this money.

274.     Under principles of equity and good conscience, Defendant should not be permitted to keep this money.

275.     Plaintiffs and the members of the Class are thus entitled to recovery of the funds they expended to purchase the Defendants' misbranded Coca-Cola products, together with punitive damages.

## NINTH CAUSE OF ACTION
### (Declaratory Judgment That Defendants Violated Federal and State Laws Regarding Mislabeled and Misbranded Food Products)

276.     Plaintiffs repeat and reallege each of the above allegations as if fully set forth herein.

277.     The manufacture, sale, delivery or offer to deliver of a misbranded food product is an illegal act in Massachusetts.  Such practices are expressly prohibited by Federal and Massachusetts law.

278.     The manufacture, sale, delivery or offer to deliver of a misbranded product violates the public policy of Massachusetts.

279.     The sale of a misbranded product in Massachusetts constitutes an illegal contract and is void under Federal law and the laws of Massachusetts.

280.     Plaintiffs and other members of the Class who purchased Coca-Cola in Massachusetts further seek to enjoin such unlawful deceptive and unconscionable trade practices as described above.  Each of the Class members who purchased Coca-Cola in Massachusetts will be irreparably harmed unless the unlawful actions of the Defendants are enjoined in that Defendants will continue to falsely and misleadingly and unlawfully conceal the artificial flavors

and chemical preservatives contained in Coca-Cola and to illegally manufacture, distribute, and sell this illegally labeled, misbranded product in violation of the food and drug laws that prohibit such actions.  Plaintiffs and other members of the Class who purchased Coca-Cola in Massachusetts therefore seek to enjoin the manufacture, distribution, or sale of any mislabeled or misbranded Coca-Cola in Massachusetts and further request an order granting them injunctive relief ordering appropriate corrective advertising and appropriate disclosures on the labeling in advertising, marketing, and promotion of Coca-Cola in Massachusetts.

281.    A case or controversy exists among Plaintiffs, the Class and Defendants as to applicability of the federal and state laws as to each Defendant.

282.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have suffered and will continue to suffer damages.

283.    Plaintiffs, on behalf of themselves and the Class, request a declaration of rights and duties with respect to all Defendants including a declaration that the Defendants Coca-Cola products are illegally labeled and misbranded, and an Order enjoining Defendants from continuing to market, advertise, distribute, and sell Coca-Cola in the unlawful manner described herein; and ordering Defendants to engage in corrective action.

284.    Absent such injunctive relief, Defendants will continue to illegally manufacture, distribute, and sell mislabeled and misbranded Coca-Cola to the detriment of consumers in the state of Massachusetts.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury of Plaintiff's claims.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually, and on behalf of all other similarly situated persons, pray for judgment against Defendants as follows:

A.     For an order certifying this case as a class action and appointing Plaintiffs and Plaintiffs' counsel to represent the Class;

B.     For an order awarding, as appropriate, damages, restitution, and/or disgorgement to Plaintiffs and the Class including all monetary relief to which Plaintiffs and the Class are entitled pursuant to under Massachusetts law, including Massachusetts ALM GL ch. 93A *et seq.*  Plaintiffs and the Class expressly seek the minimum statutory penalties provided for as a result of Defendants' violation of Massachusetts ALM GL ch. 93A *et seq.* and the augmented damages they are entitled to as a result of the Defendants' willful, knowing and bad faith acts, pursuant to the doubling and trebling and other damage augmentation provisions of Massachusetts ALM GL ch. 93A *et seq.*

C.     For an order requiring Defendants to immediately cease and desist from selling Coca-Cola in violation of law; enjoining Defendants from continuing to manufacture, deliver, offer to deliver, market, advertise, distribute, and sell Coca-Cola in the unlawful manner described herein; and ordering Defendants to engage in corrective action;

D.     For all equitable remedies available pursuant to Massachusetts ALM GL ch. 93A *et seq.* and as a result of the fact that the sale of a misbranded product is an illegal contract that is void under Massachusetts law.

E.     For an order awarding attorneys' fees and costs;

F.     For an order awarding punitive damages;

G.     For an order awarding pre-judgment and post-judgment interest; and

H.     For an order providing such further relief as this Court deems just and proper.

//

//

//

1   Dated: Boston, Massachusetts

2          September 22, 2014

3                                       MIRABELLA LAW, LLC

4                                       By: ____/s/Erica Mirabella____

5                                       Erica C. Mirabella

6                                       MIRABELLA LAW, LLC
                                      132 Boylston Street, 5th Floor

7                                       Boston, MA  02116
                                      Telephone: 617-580-8270

8                                       Facsimile: 617-583-1905
                                      erica@mirabellaLLC.com

9                                       Charles J. LaDuca

10                                     Bonnie J. Prober
                                      CUNEO GILBERT & LADUCA, LLP

11                                     8120 Woodmont Avenue, Suite 810
                                    Bethesda, MD 20814

12                                     Telephone: 202-789-3960
                                    Facsimile: 202-589-1813

13                                     charles@cuneolaw.com

14                                     bprober@cuneolaw.com

15                                     Don Barrett

16                                     DON BARRETT, P.A.
                                    P.O. Box 927

17                                     404 Court Square North
                                    Lexington, MS 39095

18                                     Telephone: (662) 834-2488
                                    Toll Free: (877) 816-4443

19                                     Fax: (662) 834-2628
                                    donbarrettpa@gmail.com

20                                     Robert A. Clifford

21                                     CLIFFORD LAW OFFICES, PC
                                    120 North LaSalle, 31st Floor

22                                     Chicago, IL 60602
                                    Telephone: (312) 899-9090

23                                     Facsimile: (312) 251-1160
                                    chd@cliffordlaw.com

24                                     Zona Jones

25                                     PROVOST UMPHREY LAW FIRM, LLP
                                    490 Park Street

26                                     Beaumont, Texas 77701
                                    Telephone: (409) 835-6000

27                                     Fax: (409) 813-8618
                                    zjones@pulf.com

28

AMENDED CLASS ACTION COMPLAINT
Case Number:  4:14-MD-02555-JSW

1

Keith M. Fleischman
THE FLEISCHMAN LAW FIRM, PLLC
2
565 Fifth Avenue, Seventh Floor
New York, New York 10017
3
Telephone: (212) 880-9571
Fax:  (917) 591-5245
4
keith@fleischmanlawfirm.com

5
Dewitt M. Lovelace
LOVELACE AND ASSOCIATES, LLC
6
12870 U.S. Hwy 98 West, Suite 200
Miramar Beach, FL 32550
7
Telephone: (850) 837-6020
Fax: (850) 837-4093
8
dml@lovelacelaw.com

9
Ben F. Pierce Gore
PRATT & ASSOCIATES
10
1871 The Alameda, Suite 425
San Jose, CA 95126
11
Telephone: 408.429.6506
Facsimile: 408.369.0752
12
pgore@prattattorneys.com

13

14
*Counsel for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT
Case Number:  4:14-MD-02555-JSW