Tammy B. Webb (SBN 227593)
tbwebb@shb.com
SHOOK, HARDY & BACON L.L.P.
One Montgomery, Suite 2700
San Francisco, California  94104
Telephone:  (415) 544-1900
Facsimile:  (415) 391-0281

Steven A. Zalesin (admitted *pro hac vice*)
sazalesin@pbwt.com
Travis J. Tu (admitted *pro hac vice*)
tjtu@pbwt.com
Michelle W. Cohen (admitted *pro hac vice*)
mcohen@pbwt.com
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone:  (212) 336-2000
Facsimile:  (212) 336-2222

*Attorneys for All Defendants*

REDACTED VERSION OF DOCUMENT
SOUGHT TO BE SEALED:

Pages marked to be redacted: 1, 4, 13, 14, 23.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: COCA-COLA PRODUCTS MARKETING AND SALES PRACTICES LITIGATION (NO. II) | Case No. 4:14-md-2555-JSW<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Complaint Filed:  August 27, 2013<br>Judge:  Hon. Jeffrey S. White<br>Hearing:  August 18, 2017<br>Courtroom:  5 |

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF ISSUES TO BE DECIDED ........................................................2

FACTS ...........................................................................................................................2

    **A.** Plaintiffs' Claims ..........................................................................................2
    **B.** Fact Discovery ...............................................................................................3
    **C.** Consumer Survey Evidence ......................................................................5

        **1.** Coca-Cola's Expert Survey Evidence ...........................................6
        **2.** Plaintiffs' Rebuttal .............................................................................9
        **3.** Coca-Cola's Internal Research .......................................................12

SUMMARY OF ARGUMENT ...................................................................................14

ARGUMENT ................................................................................................................15

I.   THE NAMED PLAINTIFFS LACK STANDING .........................................15

    **A.** Article III Standing Requires A Showing Of Imminent Injury ......................15
    **B.** Plaintiffs' Inability To Show Imminent Injury Deprives Them Of Article III
        Standing .........................................................................................................19
    **C.** The Massachusetts, New York And New Jersey Plaintiffs Also Lack Statutory
        Standing To Pursue Their Consumer-Protection Claims ................................20

II.  PLAINTIFFS HAVE NOT MET THE REQUIREMENTS OF RULE 23(a)......................21

    **A.** Plaintiffs' Heavy Evidentiary Burden .......................................................21
    **B.** Typicality.......................................................................................................22
    **C.** Commonality .................................................................................................25

CONCLUSION..............................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
  2010 U.S. Dist. LEXIS 132948 (D. Utah Dec. 15, 2010)...........................................12

*Ackerman v. Coca-Cola Co.*,
  2013 U.S. Dist. LEXIS 184232 (E.D.N.Y. July 17, 2013)......................................26

*Algarin v. Maybelline, LLC*,
  300 F.R.D. 444 (S.D. Cal. May 12, 2014) ...........................................................27

*Anderson v. Hain Celestial Gr.*,
  87 F. Supp. 3d 1226, 1235 (N.D. Cal. 2015) ......................................................18

*Anderson v. SeaWorld Parks & Entm't, Inc.*,
  2016 U.S. Dist. LEXIS 100504 (N.D. Cal. Aug. 1, 2016) (White, *J.*) ................. *passim*

*Astiana v. Ben & Jerry's Homemade, Inc.*,
  2014 U.S. Dist. LEXIS 1640 (N.D. Cal. Jan. 7, 2014) .......................................24

*Bellermann v. Fitchburg Gas and Elec. Lighting Co.*,
  470 Mass. 43 (Mass. 2014).................................................................................26

*Berger v. Home Depot USA, Inc.*,
  741 F.3d 1061 (9th Cir. 2014) (overruled in part on other grounds by *Microsoft
  Corp. v. Baker*, 137 S. Ct. 1702 (2017)) ............................................................27

*Brown v. Hain Celestial Gr.*,
  2014 U.S. Dist. LEXIS 161036 (N.D. Cal. Nov. 14, 2014)..................................26

*Castagnola v. Hewlett-Packard Co.*,
  2012 U.S. Dist. LEXIS 82026 (N.D. Ca. June 13, 2012) (White, J.) ..................20

*CKE Rest. v. Jack in the Box, Inc.*,
  494 F. Supp. 2d 1139 (C.D. Cal. 2007) ...............................................................10

*Coe v. General Mills, Inc.*,
  2017 U.S. Dist. LEXIS 16581 (N.D. Cal. Feb. 6, 2017) ....................................18

*Commonwealth v. AmCan Enters.*,
  712 N.E.2d 1205 (Mass. 1999) ...........................................................................24

*In re Conagra Foods*,
  302 F.R.D. 537 (C.D. Cal. 2014)........................................................................16

*In re Conagra Foods, Inc.*,
  90 F. Supp. 3d 919, 1019 (C.D. Cal. 2015) ....................................................................25

*Cox v. Sears Roebuck & Co.*,
  138 N.J. 2 (1994) ............................................................................................................24

*Duncavage v. Allen*,
  147 Ill. App. 3d 88 (Ill. App. 1986) ...............................................................................24

*Duran v. Hampton Creek*,
  2016 U.S. Dist. LEXIS 41650 (N.D. Cal. Mar. 28, 2016) ..............................................17

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ............................................................................15, 23, 24

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  2015 U.S. Dist. LEXIS 16034 (S.D.N.Y. Feb. 10, 2015) ................................................10

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
  528 U.S. 167 (2000) ........................................................................................................16

*Gates v. Rohm & Haas Co.*,
  655 F.3d 255 (3d Cir. 2011) ...........................................................................................22

*Gen. Tel. Co.of the Southwest v. Falcon*,
  457 U.S. 147 (1982) ...................................................................................................23, 24

*Goldemberg v. Johnson & Johnson Consumer Cos.*,
  317 F.R.D. 374 (S.D.N.Y. 2016) .....................................................................................27

*GoSmile, Inc. v. Levine*,
  769 F. Supp. 2d 630 (S.D.N.Y. 2011) .............................................................................11

*Hinojos v. Kohl's Corp.*,
  718 F.3d 1098 (9th Cir. 2013) ........................................................................................24

*Hodgers-Durgin v. De La Vina*,
  199 F.3d 1037 (9th Cir. 1999) ........................................................................................20

*Holmes v. Continental Can Co.*,
  706 F.2d 1144 (11th Cir. 1983) ......................................................................................22

*Hughes v. Ester C Co.*,
  317 F.R.D. 333 (S.D.N.Y. 2016) .....................................................................................26

*In re Hulu Privacy Litig.*,
  2014 U.S. Dist. LEXIS 83661 (N.D. Cal. June 17, 2014 ................................................12

*Hutson v. Rexall Sundown, Inc.*,
  837 So. 2d 1090 (Fl. App. Ct. 2003) ..............................................................................26

*Johnson v. Harley-Davidson Motor Co. Gr., LLC*,
    285 F.R.D. 573 (E.D. Cal. 2012) ................................................27

*Kosta v. Del Monte Foods, Inc.*,
    308 F.R.D. 217 (N.D. Cal. 2015) ................................................27

*Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*,
    735 F.3d 735 (7th Cir. 2013) ................................................10, 12

*Lilly v. Jamba Juice Co.*,
    2015 U.S. Dist. LEXIS 34498 (N.D. Cal. Mar. 18, 2015) ................................17

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ................................................15, 17

*Lucas v. Jos. A. Bank Clothiers, Inc.*,
    2015 U.S. Dist. LEXIS 61550 (S.D. Cal May 8, 2015) ................................18, 20

*Mann v. TD Bank, N.A.*,
    2010 U.S. Dist. LEXIS 112085 (D.N.J. Oct. 20, 2010 ................................26

*Mason v. Coca-Cola Co.*,
    774 F. Supp. 2d 699 (D.N.J. 2011) ................................................21

*Mayfield v. United States*,
    599 F.3d 964 (9th Cir. 2010) ................................................14, 15, 20

*McCrary v. Elations Co., LLC*,
    2014 U.S. Dist. LEXIS 8443 (C.D. Cal. Jan. 13, 2014) ................................25

*Moore v. Apple, Inc.*,
    309 F.R.D. 532 (N.D. Cal. 2015) ................................................27

*Mullins v. Premier Nutrition Corp.*,
    178 F. Supp. 3d 867, 881 (N.D. Cal. 2016) ................................................11

*O'Connor v. Boeing N. Am., Inc.*,
    197 F.R.D. 404 (C.D. Cal. 2000) ................................................23

*Ortega v. Natural Balance*,
    300 F.R.D. 422 (C.D. Cal. 2014) ................................................25

*Oshana v. Coca-Cola Co.*,
    225 F.R.D. 575 (N.D. Ill. 2005), *affirmed*, 472 F.3d 506 (7th Cir. 2006) ................................26

*Parks, LLC v. Tyson Foods, Inc.*,
    No. 5:15-cv-00946, 2015 U.S. Dist. LEXIS 98008 (E.D. Pa. July 28, 2015) ................................11

*Profant v. Have Trunk Will Travel*,
    2011 U.S. Dist. LEXIS 139248 (C.D. Cal. Nov. 29, 2011) ................................18

*Rahman v. Mott's LLP*,
    2014 U.S. Dist. LEXIS 147102 (N.D. Cal. Oct. 14, 2014)................................16, 18, 19

*Reese v. Odwalla, Inc.*,
    2017 U.S. Dist. LEXIS 20208 (N.D. Cal. Feb. 13, 2017) ...........................................18

*Ries v. Ariz. Bevs. USA, LLC*,
    287 F.R.D. 523 (N.D. Cal. 2012)...............................................................................19

*Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*,
    2016 U.S. Dist. LEXIS 133828 (D. Minn. Sept. 28, 2016) ........................................12

*Shaulis v. Nordstrom Inc.*,
    120 F. Supp. 3d 40, 52 (D. Mass. 2015) ...................................................................21

*Small v. Lorillard Tobacco Co.*,
    94 N.Y. 2d 43 (1999) .................................................................................................21

*Turcios v. Carma Labs, Inc.*,
    296 F.R.D. 638 (C.D. Cal. 2014) ...............................................................................27

*Victor v. R.C. Bigelow, Inc.*,
    13 Civ. 2976 (N.D. Cal.)............................................................................................11

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................................ *passim*

*Water Pik, Inc. v. Med-Systems, Inc.*,
    726 F.3d 1136 (10th Cir. 2013) .................................................................................10

**Other Authorities**

Fed. R. Civ. P. 23 ....................................................................................................... *passim*

### PRELIMINARY STATEMENT

Plaintiffs began this case with grand ambitions.  In their pleadings and in repeated submissions to this Court, Plaintiffs asserted that misleading label statements and omissions about phosphoric acid had influenced the purchasing decisions of all Coke consumers, causing them to overpay for every unit of Coke sold during the class period.  The evidence, Plaintiffs claimed, would prove "the class-wide materiality of the label statements" and entitle them to "class-wide monetary relief."

But the proof that Plaintiffs promised never materialized.  Their case for class-wide damages so thoroughly collapsed that Plaintiffs have abandoned their effort to obtain any monetary recovery on behalf of the absent class members.  And their attempt to demonstrate "the class-wide materiality of the [challenged] label statements"—as is necessary to certify the injunctive-relief class that Plaintiffs now seek—fared no better.  Though they shoulder the burden of proof on class certification, Plaintiffs adduced no fact or expert evidence that bears on this critical issue.  Coca-Cola, meanwhile, commissioned a survey of 2,400 putative class members that shows that the presence or absence of the disputed label claims has no meaningful impact on either consumers' interest in purchasing Coke or the price they are willing to pay for it.  These findings are consistent with Coca-Cola's ordinary course of business research.  While Plaintiffs distort the record to suggest otherwise, ██████████████████████████████████████████████████ ████████████████████████████████████████

Faced with this unenviable record, Plaintiffs have commendably refrained from making a pointless motion to certify a damages class under Fed. R. Civ. P. 23(b)(3).  Instead they ask the Court to certify a declaratory and injunctive relief class pursuant to Fed. R. Civ. P. 23(b)(2).  This request, however, is also futile, for two overarching reasons.  *First*, the named plaintiffs do not have standing to pursue injunctive relief, a remedy that the Constitution limits to those at risk of imminent injury.  Plaintiffs have already formed the view that phosphoric acid acts as an artificial flavor and a chemical preservative in Coke, so they can never again be deceived by Coca-Cola's purported failure to disclose those functions.  And Plaintiffs' apprehension of the injury they could experience

if Coca-Cola were to *change* Coke's formula—the most famous and jealously-guarded trade secret in history—is as far from "imminent" as one can imagine.

*Second*, the same insurmountable evidence that deterred Plaintiffs from seeking class-wide damages precludes certification of *any* class under Rule 23. Certification requires, among other things, a showing that central issues are susceptible of common proof and that the named plaintiffs' injuries are typical of those of the class. Neither of these requirements can be satisfied where, as here, the challenged label statements were demonstrably immaterial to the vast majority of class members' purchasing decisions. Plaintiffs' motion should accordingly be denied.

## STATEMENT OF ISSUES TO BE DECIDED

Should a class be certified under Rule 23(b)(2) where (1) the named plaintiffs are at no risk of future injury; and (2) they cannot carry their burden to satisfy the typicality and commonality requirements of Rule 23(a)?

## FACTS

### A. Plaintiffs' Claims

Plaintiffs' claims concern the labeling of Coca-Cola's flagship product, Coke. As Plaintiffs themselves allege, Coke is an iconic American soft drink, and consumers the world over enjoy Coke for its taste and refreshment. *See* Consol. Am. Compl. ("CAC") ¶ 2. Research bears this out. As discussed in greater detail below, a survey of thousands of Coke buyers across the country shows that "taste" and "refreshment" are far and away the most common reasons for purchase. *See* Declaration of Jane Metcalf, Ex. 1 (Poret Expert Report) at 51, 56.

Plaintiffs initiated this action in 2013, asserting that they bought Coke for a different reason—namely, because Coke does not contain artificial flavors or preservatives. Plaintiffs further alleged that their expectations in this regard were not met because Coke contains phosphoric acid, which Plaintiffs maintain is both an artificial flavor and a chemical preservative under U.S. Food and Drug Administration ("FDA") regulations.

Plaintiffs challenged three aspects of Coke's labeling. Their primary contention was that the

so-called "Pemberton claim"[1] ("no artificial flavors.  no preservatives added.  since 1886"), which appeared on some Coke labels during the class period, was misleading due to the presence of phosphoric acid in the product.  Relatedly, they alleged that Coca-Cola misled them because, though phosphoric acid appears in Coke's ingredient list, its purported flavoring and preservative functions are not disclosed.  Finally, Plaintiffs alleged that they were misled by the separate claim "Original Formula," which, they maintained, falsely suggested that Coke was "still made with the 'original formula' devised by Pemberton in 1886."  *See* CAC ¶¶ 14-16, 20-24, 110-13, 119; Lazaroff Am. Compl. ("AC")  ¶¶ 14-16, 20-22; Marino AC ¶¶ 14-16, Sowizrol AC ¶¶ 14-16, 20-22.

Plaintiffs alleged that these label statements were highly influential to them.  Although all eight of the named plaintiffs have enjoyed Coke since childhood, they claimed that they would not have purchased Coke during the class period, or would have paid less for it, had they known that phosphoric acid was an artificial flavor and preservative.  *See* CAC ¶¶ 132-33, 139-40; Lazaroff AC ¶¶ 143-46, 158-61; Marino AC ¶¶ 148-151, 157-58, 166; Sowizrol AC ¶¶ 140-42, 149-50.

According to Plaintiffs, the disputed label statements influenced not only them, but all Coke buyers.  Plaintiffs therefore sought to bring consumer-protection claims on behalf of themselves and all Coke purchasers in their respective states during the applicable limitations periods, which stretch back as far as 2008.  CAC ¶ 143; Lazaroff AC ¶ 163; Marino AC ¶ 168; Sowizrol AC ¶ 159.  Each plaintiff purported to bring class claims under his or her home state's consumer-protection statute, alleging entitlement to money damages—including the entire purchase price paid by each Coke buyer—as well as punitive damages and attorneys' fees.  *See generally* Prayers for Relief.

**B.    Fact Discovery**

In July 2015, the Court ordered that discovery proceed in phases, with Phase I to focus on whether the named plaintiffs relied on the challenged statements, and Phase II on whether their claims were suitable for class treatment.  Coca-Cola moved for partial summary judgment at the conclusion of Phase I and, in May 2016, the Court granted the motion in part, concluding that six of the eight named plaintiffs had no viable claims against the Original Formula claim because their

---

[1] The claim is named for John Stith Pemberton, the founder of Coca-Cola.

sworn deposition testimony revealed that they had not relied on the claim in making their Coke purchases.  *See* Order on Defs. Mtn. (Dkt. No. 116) at 9-15.  The Court reserved judgment on several issues raised in Coca-Cola's motion, including whether the Plaintiffs had demonstrated monetary injury, as required by several of the relevant consumer-protection statutes.  *Id.* at 4-5.

Shortly thereafter, Plaintiffs served Coca-Cola with far-reaching discovery requests aimed at uncovering proof of class-wide materiality, injury, and damages.  Plaintiffs sought detailed information relating to, among other topics, (1) sales and pricing of Coke; (2) consumers' views about the disputed label claims, and about Coke more generally; and (3) the intended and actual "effects" of the claims on consumers.  Metcalf Decl., Ex. 2 (Pls.' Phase II Document Requests). Plaintiffs asserted that discovery on these topics was necessary to "demonstrate why materiality can be proven on a class-wide basis" and to show their entitlement to "class-wide monetary relief."  *See* Metcalf Decl., Ex. 3 (Sept. 7, 2016 Ltr. from J. Glatter); Ex. 4 (Oct. 14, 2016 Joint Discovery Dispute Letter Re: Financials (Dkt. No. 136)) at 2.

Plaintiffs obtained the discovery they sought on each of these topics.  Coca-Cola produced more than 38,000 pages of documents, including detailed week-by-week pricing information; reams of internal consumer research conducted by Coca-Cola (as well as internal communications about that research); and thousands of documents relating to labeling design for Coke.

But this comprehensive discovery yielded no evidence of class-wide materiality, injury, or damages.  In fact, the evidence proved the opposite.  For example, as discussed in more detail below, Coca-Cola's internal research showed ███████████████████████████████████████ ██████████████████████████████████  Similarly, Coca-Cola's sales and pricing information reflected that the price of Coke did not change based upon whether the Pemberton or Original Formula claims were included on the labels.

Fact discovery also showed that the disputed aspects of Coke labeling were not the calculated efforts at consumer deception that Plaintiffs alleged them to be.  Coca-Cola added the Original Formula claim to Coke in 1985, after consumer backlash to the launch of "New Coke" prompted Coca-Cola to bring back the original product formula.  The claim sought to reassure consumers that

Coke Classic was the product they knew and loved.  And Coca-Cola added the Pemberton claim in 2008 not only to educate consumers about Coke's ingredients, but to standardize U.S. packaging with that of certain European countries, where the claim was already in use.  Metcalf Decl., Ex. 5 (Coca-Cola Supp. Responses to Phase II Interrogatories) Nos. 2, 6.

Both claims, moreover, appeared only intermittently on Coke labeling.  Neither appeared on every Coke package type; for example, the Pemberton claim was never placed on "single-serve" containers such as 20-ounce bottles.  Metcalf Decl., Ex. 6 (Coca-Cola First Am. Responses to Phase II Interrogatories) No. 12.  And even within a given package type, there is no single "Coke label": the labels change many times throughout the year to permit temporary seasonal or regional embellishments, sports tie-ins, or other promotions that often displaced the Pemberton and Original Formula claims.

In fact, because of these frequent variations, Coca-Cola generated more than 5,000 unique label designs for Coke during the class period.  That collection of designs, which Coca-Cola produced to Plaintiffs during class-certification discovery, shows that the Pemberton claim appeared on *less than 20 percent* of Coke labels generated during the putative class period, while the Original Formula claim appeared on approximately *65 percent*.  *See* Declaration of Russell Bonds ("Bonds Decl.") ¶ 3, Exs. 1-4.

Of the three aspects of Coke labeling that Plaintiffs challenge, only the ingredient list appeared consistently on Coke labels throughout the putative class period.

### C.   Consumer Survey Evidence

At the class-certification stage, Plaintiffs have the burden to prove that their claims are suitable for class-wide adjudication.  Plaintiffs never made any serious attempt to meet their burden.  On the deadline set by the Court for exchange of affirmative expert reports, Plaintiffs disclosed no experts and served no reports.  Indeed, over the course of class-certification discovery, Plaintiffs proffered no affirmative evidence whatsoever in support of their allegations of class-wide deception, materiality, or injury.

1      **1.      Coca-Cola's Expert Survey Evidence**

2          Though it bears no burden of proof, during class-certification discovery Coca-Cola proffered

3   a report from a leading expert in consumer research, Hal Poret.  *See* Metcalf Decl., Ex. 1 (Poret

4   Report).  Mr. Poret conducted two scientifically rigorous surveys of Coke purchasers.  Together,

5   these surveys demonstrate that the challenged label statements and omissions are not material to the

6   vast majority of consumers, and that, to the extent they relied on these aspects of Coke labeling,

7   Plaintiffs are highly atypical of the classes they seek to represent.  *Id.* at 4-5; 68-69.

8      **a.      The Ingredient Panel Survey**

9          Mr. Poret's first survey—the "Ingredient Panel Survey"—was designed to assess the reasons

10  why consumers purchase Coke and the impact, if any, that ingredient panel disclosures regarding the

11  purported function of phosphoric acid would have on Coke buyers.  *Id.* at 9-13.  A sample of 1200

12  past Coke purchasers was recruited, consisting of 200 from each of the six states in which the

13  Plaintiffs reside.  *Id*. at 9-10.

14         At the outset, the survey respondents were asked about their reasons for purchasing Coke.

15  *Id.* at 10.  The most common reasons were taste (cited by 67% of respondents); thirst-quenching and

16  refreshing (30%); particular uses such as for entertaining, to enjoy with food, or as a mixer (27%);

17  price-related reasons (27%); and habit (16%).  *Id.* at 55-56.  Although they were given multiple

18  opportunities to describe their purchase motivations, not one of the 1200 respondents cited the

19  absence of artificial flavors or preservatives as a reason for buying Coke.  *Id.* at 56.  Nor did any of

20  the respondents indicate that they purchased Coke because it is natural or healthy.  *Id.*

21         Next, half of the respondents in the Ingredient Panel Survey were randomly assigned to a

22  "Test" group that was shown the Coke ingredient panel as it actually appears on the label.  *Id.* at 11.

23  The other half were assigned to a "Control" group that was shown a modified version of the

24  ingredient panel, which listed the ingredients in the manner that, pursuant to FDA regulations, they

25  would appear if phosphoric acid actually were an artificial flavor and a chemical preservative.[2]  *Id.*

26  ───────────────

27  [2] In their opening brief, Plaintiffs incorrectly assert that Mr. Poret did not test the impact of treating
    phosphoric acid as an artificial flavor.  (Pls. Br. at 22)  As Coca-Cola has explained in prior court
    submissions, if phosphoric acid were both an artificial flavor and a chemical preservative, FDA
28  regulations would permit Coca-Cola to follow the standard practice of listing "artificial flavors"

Both groups were then asked the same questions about their purchase interest and perceptions of the product's price. *Id.* at 12-14.

The results showed that the disclosures that Plaintiffs contend are missing from Coke labels are not material to the vast majority of consumers. *Id.* at 39. In fact, the survey found that disclosures of artificial flavors and of phosphoric acid's purported function as a preservative would negatively impact the purchase decisions of, at most, 2% of Coke consumers—a difference that was not statistically significant. *Id.* Ingredient panel disclosures similarly had no impact on consumers' perceptions of Coke's price. *Id.*

### b.     The Full Label Study

Mr. Poret's second survey—the "Full Label Study"—used the same methodology, but was designed to assess the reasons why consumers purchase Coke in 2-Liter bottles, and the impact, if any, of the affirmative statements "no artificial flavors," "no preservatives added," and "original formula." *Id.* at 36. Mr. Poret tested the 2-Liter bottle because, unlike the ingredient panel, which appears on every container of Coke, the affirmative statements that Plaintiffs dispute (*i.e.*, the Pemberton and Original Formula claims) appeared only on certain Coke containers, including (at times) the 2-Liter bottle.[3]

Another sample of 1200 past purchasers of Coke in 2-Liter bottles was recruited from the states in which the plaintiffs reside. *Id.* at 14, 51. Like the Ingredient Panel Study, the Full Label Study began by asking respondents about their reasons for purchasing Coke. *Id.* at 14. The most common responses included taste (61%); uses such as entertaining, to enjoy with food, or to use as a mixer (40%); price (32%); for family, friends, or guests (23%); and thirst-quenching or refreshing

---

generically without identifying the individual flavors themselves. At the same time, the regulations would require Coca-Cola to identify phosphoric acid in the ingredient list as a preservative. *See* Coca-Cola Mot. to Dismiss (13-cv-3990, Dkt. No. 30) at 5-6 (citing 21 C.F.R. §§ 101.22(h)(1), 101.22(j)). Mr. Poret's control stimulus followed these FDA prescriptions to the letter. *See* Metcalf Decl., Ex. 1 (Poret Report) at 12.

[3] Plaintiffs take issue with Mr. Poret's decision to test the 2-Liter bottle because these statements also appeared at times on the packaging for 12- and 24-pack cans. (Pls. Br. at 22) As Mr. Poret explained at his deposition, there is no reason to think that these statements were more impactful on the packaging for cans than on the 2-Liter bottle. Metcalf Decl., Ex. 7 (Poret Tr.) at 268-76. The findings of his survey, therefore, are equally applicable to those package types. *Id.* Plaintiffs cite no evidence to the contrary.

(20%).  *Id*. at 62-63.  Once again, not a single respondent cited the absence of artificial flavors or preservatives, or Coke's "natural" or "healthy" qualities, as reasons for their purchases.  *Id*. at 63.

Half the respondents were assigned to a "Test" group that was shown an actual 2-Liter Coke bottle that included the Pemberton and Original Formula claims.  *Id*. at 15, 51.  The other half were assigned to a control group that was shown a modified version of the 2-Liter bottle with these statements removed.[4]  *Id*. at 15, 51.  Respondents could rotate the label to review all of its contents, and were required to do so at least once before continuing with the survey.  *Id*. at 26.  Both groups were then asked the same questions about purchase interest and price that were asked of respondents in the Ingredient Panel Study.  *Id*. at 36-37.

The results showed that the Pemberton and Original Formula claims are not material to most consumers.  *Id*. at 66-67.  In fact, the survey found that these statements have a positive impact on the purchase decisions of, at most, 5% of consumers.  This difference was statistically significant, but as Mr. Poret explains in his expert report, a 5% difference nonetheless is "very small" and indicates that the statements are not material to 95% of Coke purchasers.  *Id*. at 66.  In any event, the Pemberton and Original Formula claims had zero impact on consumers' perceptions of Coke's price.  *Id*. at 67.

### c.    Mr. Poret's Conclusions

Based upon the results of his two surveys, Mr. Poret drew several conclusions that give the lie to Plaintiffs' arguments in support of class certification.  First, Mr. Poret concluded that consumers purchase Coke for taste and other reasons, not based on the absence of artificial flavors or preservatives.  *Id*. at 68.  Second, disclosing the presence of artificial flavors and identifying phosphoric acid as a preservative in the ingredient panel for Coke would have no material impact on consumers' purchase decisions or perceptions of Coke's price.  *Id*.  And third, the Pemberton and Original Formula claims would potentially impact, at most, 5% of consumers.  *Id*.

---

[4] As in the Ingredient Panel Survey, the ingredient panel on the modified label shown to the control group in the Full Label Study was changed to disclose the presence of artificial flavors and identify phosphoric acid as a preservative.

### 2.      Plaintiffs' Rebuttal

To rebut Mr. Poret's opinions, Plaintiffs proffered Dr. Christiane Schroeter, an associate professor of "agribusiness."  Dr. Schroeter conducted no consumer surveys of her own.  Nor did she offer any views as to the reasons consumers purchase Coke, how they read Coke labels, what statements on Coke labels (if any) influence their purchasing decisions, or whether the named plaintiffs are typical of other class members.[5]  Rather, Dr. Schroeter's rebuttal report merely took pot-shots at Mr. Poret's methodology and cited several market research studies conducted by Coca-Cola in the ordinary course of business that, in her opinion, Mr. Poret should have considered.  *See* Declaration of Richard Barrett, Ex. P (Schroeter Expert Report) (Dkt. No. 160-17) at 7-35.

In their motion for class certification, Plaintiffs assert that Dr. Schroeter's criticisms of Mr. Poret's surveys render his opinions inadmissible, but that position is untenable.  Plaintiffs filed no *Daubert* motion to exclude Mr. Poret's opinions, and Dr. Schroeter's methodological criticisms do not withstand scrutiny.  For example:

- Plaintiffs assert that Mr. Poret did not "pre-test" his survey for problems.  However, Mr. Poret testified at deposition that he closely monitored the first batch of interviews and observed no problems, which is the functional equivalent of conducting a pre-test.  *See* Poret Tr. at 153.

- Plaintiffs criticize Mr. Poret for not asking "why" respondents answered his purchase interest and price questions in the manner they did.  However, in a controlled scientific experiment such as Mr. Poret's surveys, which compares the results of the test and control groups, any difference in responses is necessarily due to the differences in the labels that the two groups reviewed.  *See* Shari S. Diamond, Reference Guide on Survey Research, in Reference Manual on Scientific Evidence 398 (3d ed. 2011) ("By adding one or more appropriate control groups, the survey

---

[5] Dr. Schroeter testified at her deposition that all of these issues were "outside the scope" of her assignment in this case.  *See* Metcalf Decl., Ex. 8 ("Schroeter Tr.") at 57-61, 65.

expert can test directly the influence of the stimulus.").[6]  In other words, the test-and-control design obviates the need to ask "why."

- Plaintiffs fault Mr. Poret for not "quantifying" his response rate, *i.e.*, the rate at which individuals accepted the initial invitation to participate in the survey.  But Mr. Poret has explained that there were safeguards in place to alert him if the response rate fell below survey industry norms.  Poret Tr. 163:22-164:25.  Because these safeguards at no point were triggered, Mr. Poret knew that the response rate was sufficient, which made it unnecessary to quantify it.  *Id.*

- Plaintiffs contend that Mr. Poret should have asked a closed-ended question about whether the "absence of preservatives" was a reason why respondents purchased Coke.  Such a question would have been highly suggestive and leading—especially since no respondents cited the absence of preservatives in response to multiple, non-leading questions about their reasons for purchase.  *See Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1147-48 (10th Cir. 2013) (criticizing survey for asking leading questions that "suggest[ed] the desired response"); *CKE Rest. v. Jack in the Box, Inc.*, 494 F. Supp. 2d 1139, 1144-45 (C.D. Cal. 2007) (a survey's "leading and suggestive questions . . . weaken[ed] the relevance and credibility of the survey evidence to the point where it shed[] little if any light on the issue of likelihood of deceiving customers").

- Plaintiffs assert that Mr. Poret used a "grossly insufficient" sample size.  In fact, Mr. Poret's sample of 2400 respondents, or 1200 per survey, is significantly larger than other samples that courts have accepted in the past.  *See, e.g., Kraft Foods Grp.*

---

[6] *See also Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 2015 U.S. Dist. LEXIS 16034, at *16-17 (S.D.N.Y. Feb. 10, 2015) ("[I]t is axiomatic that, when designing an experiment to test whether an observed result was caused by given variable, the control or benchmark group must lack that variable.  That is the whole point of a control group.").

*Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 742 (7th Cir. 2013) (crediting Poret survey of 300 consumers).[7]

- Plaintiffs contend that Mr. Poret "biased the sample" by including all Coke purchasers rather than people who purchased Coke for their own consumption or who fit the demographic profile of a "typical" Coke purchaser. But Mr. Poret's sample is representative of the proposed classes as Plaintiffs have defined them. Plaintiffs seek to represent classes of "all" Coke purchasers in their respective states, not merely those who bought Coke for their own consumption or are otherwise "typical."

- Plaintiffs assert that Mr. Poret "failed to correctly calculate" the percentages of respondents for whom the alleged omissions and misrepresentations were material. Mr. Poret, however, determined the percentage of *all Coke purchasers* who would be negatively impacted by the alleged omissions and positively impacted by the alleged misrepresentations—thus tracking Plaintiffs' proposed class definition. That is the legally proper way to calculate materiality for the survey sample as a whole.[8]

- Plaintiffs correctly note that one of the labels in Mr. Poret's survey of the full 2-Liter label misspelled the word "caffeine" in the ingredients list as "caffiene." There is no reason whatsoever to think that this inconspicuous typo influenced the results of the Full Label Study, especially when the Ingredient Panel Survey, which did not contain the typo, reached the same conclusions.

In addition to these spurious methodological criticisms, Plaintiffs attack Mr. Poret's qualifications by misleadingly asserting that Judge Posner has criticized him as a "professional

---

[7] *See also Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 881 (N.D. Cal. 2016) (denying motion to exclude Poret survey of 400 consumers); *GoSmile, Inc. v. Levine*, 769 F. Supp. 2d 630, 643 (S.D.N.Y. 2011) (crediting Poret survey of 400 consumers); *Parks, LLC v. Tyson Foods, Inc.*, 2015 U.S. Dist. LEXIS 98008, at *49 (E.D. Pa. July 28, 2015) (crediting consumer survey of 200 respondents). Notably, in the one prior case in which Dr. Schroeter has been the proponent of a survey of her own design, Dr. Schroeter relied on a sample of just 52 consumers to assess the views of tea drinkers nationwide. *Victor v. R.C. Bigelow, Inc.*, 13 Civ. 2976 (N.D. Cal.) (Dkt. No. 95-3) (Declaration of Dr. Christiane Schroeter).

[8] Plaintiffs apparently believe that Mr. Poret should have calculated his percentages not based upon all Coke purchasers in the sample, but based on a subset of the sample. Neither Plaintiffs nor Dr. Schroeter has proffered any authority that supports this position.

expert."  In fact, Judge Posner recognized that Mr. Poret is "an experienced survey researcher" and wrote that "we won't hold it against him" that he is a "professional expert witness."  *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 742 (7th Cir. 2013).  The Seventh Circuit then proceeded to credit the findings of Mr. Poret's survey in that case.  *Id.* at 743.  Numerous courts, including courts in this District, have similarly recognized Mr. Poret as an expert in consumer surveys.  *See, e.g., In re Hulu Privacy Litig.*, 2014 U.S. Dist. LEXIS 83661, at *34 (N.D. Cal. June 17, 2014) (denying class certification on the basis of Mr. Poret's survey and recognizing that he "has personally designed, supervised, and implemented approximately 600 surveys regarding the behaviors and opinions of consumers, designed numerous studies that have been admitted as evidence in legal proceedings, and been accepted as an expert in survey research on numerous occasions by U.S. District Court[s] and other tribunals"); *Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*, 2016 U.S. Dist. LEXIS 133828, at *52 (D. Minn. Sept. 28, 2016) ("[T]he survey was conducted using sound methodology, and the survey's results, and Poret's opinions [regarding materiality] based on those results, are admissible"); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 2010 U.S. Dist. LEXIS 132948, at *17-18 (D. Utah Dec. 15, 2010) (noting Mr. Poret's "extensive experience in consumer survey design").

### 3.    Coca-Cola's Internal Research

Plaintiffs' criticisms of Mr. Poret for "failing" to consider Coca-Cola's internal market research are equally unfounded.  In her rebuttal report, Dr. Schroeter catalogued various *methodological* differences between Coca-Cola's internal market research and Mr. Poret's surveys, but conspicuously refrained from addressing the *substance* of any of Coca-Cola studies.[9]  This is undoubtedly because their findings were entirely consistent with Mr. Poret's conclusions.  In fact, as Coca-Cola's director of custom consumer research explains in an accompanying declaration, Plaintiffs' contention that Coca-Cola's internal market research contradicts Mr. Poret's findings is demonstrably incorrect.  *See* Declaration of Linda Cavalli ("Cavalli Decl.").

---

[9] Dr. Schroeter confirmed at her deposition that she reviewed the methodology of Coca-Cola's internal market research, but not the substantive findings.  When pressed for an explanation, Dr. Schroeter reverted to her stock answer that this was "outside the scope" of her assignment.  Metcalf Decl., Ex. 8 at 148-49.

Plaintiffs assert that a ███████████████████████████ demonstrates that Coca-Cola "perceived an appreciable benefit" to including the disputed claims on Coke labels.  (Pls. Br. at 4)  In fact, this study ████████████████████████ ██████████████████████████████████ ████████████████████████████████████████ ████████████████████  Cavalli Decl. ¶¶ 10-11, Ex. 1.  Plaintiffs note that the study's authors wrote that ███████████████████████████████████████ ████████████████████████████████████ ████████████████████  [10]  *Id.* at ¶ 13, Ex. 1.  ███████████████████ ████████████████████████████████████████████████  *Id.* at ¶¶ 13-14.

Nowhere in their brief do Plaintiffs acknowledge, let alone dispute, the study's ████████ ██████████████████████████████████  Rather, Plaintiffs misleadingly cite the results █████████ █████████████████  (Pls. Br. at 4, 26)  Coca-Cola has never made █████████████ █████████████  on Coke labels, and as Ms. Cavalli explains in her declaration, the results concerning ████████████████████████████████████████████████████ ████████████████████  Cavalli Decl. ¶ 12.

Plaintiffs similarly assert that a █████████████████████████ ████████████████████████" demonstrates the "materiality" of the label statement "no artificial flavors."  (Pls. Br. at 4)  As noted above, Coca-Cola never made a stand-alone "no artificial flavors" claim on Coke labels.  But in any event, what that study ████████████████████ █████████████████████████████████████████

---

[10] In 2008, the statements "no artificial flavors" and "no preservatives added" were already in use on Coke labels in Europe, and for the sake of global consistency, Coca-Cola wished to conform Coke labels in the United States to the European ones.  Metcalf Decl., Ex. 5 (Coca-Cola Supp. Responses to Phase II Interrogatories) Nos. 2, 6.  Coca-Cola executives in the United States were amenable to the change, but only as long as the statements would not hurt purchase interest among U.S. consumers.  *Id.* ██████████████████████.

████████████████████████████████████████████████████ Cavalli Decl. ¶ 21-

23, Ex. 2.  Far from contradicting Mr. Poret's survey, ████████████████████████

████████████████████████████████ the 5% difference that Mr. Poret found in his

Full Label Survey.  Both surveys corroborate Mr. Poret's conclusion that the Pemberton claim is not

material to the vast majority of Coke purchasers.[11]

## SUMMARY OF ARGUMENT

Unable to make out a case for monetary relief, Plaintiffs urge the Court to certify an

injunctive class under Rule 23(b)(2), seeking "declaratory relief that Defendant's labeling practices

are illegal and deceitful, and an injunction barring Coca-Cola from continuing to engage in such

practices."  (Pls. Br. at 2)  Rule 23(b)(2) certification, however, is not a consolation prize for class

action plaintiffs whose proof has come up short.  It has its own stringent evidentiary requirements,

including (1) a showing that the individual named plaintiffs have standing to seek injunctive relief,

and (2) a demonstration, "after a rigorous analysis, that the prerequisites of Rule 23(a) have been

satisfied." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (internal quotation marks

omitted).

Neither of these requirements is met here.  *First*, the named plaintiffs all lack standing to

seek an injunction, because they are at no risk of suffering future injury as a result of the challenged

claims.  *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010).  Having already formed their

views that phosphoric acid is an artificial flavor and a preservative, they can never again be misled

as to that ingredient's function—even in the entirely improbable event of a change to Coke's

formula.  Thus, under this Court's analysis in *Anderson v. SeaWorld Parks & Entm't, Inc.*, 2016 U.S.

Dist. LEXIS 100504, at *21 (N.D. Cal. Aug. 1, 2016) (White, *J.*), they do not have standing to

---

[11] At the end of their brief, Plaintiffs refer to another study conducted by Coca-Cola ████████████
████████████████████████████████████████████████████████████ (Pls. Br. at 25)  In fact, the portion of the
study cited by plaintiffs █████████████████████████████████████████████████████████
████████ Cavalli Decl. ¶¶ 23-24, Ex. 3.  Rather, the study ████████████████████████
████████████████████████████████████ Unlike Mr. Poret's surveys or the other internal research
cited by Plaintiffs, this study █████████████████████████

pursue their claims.

*Second*, even if they did have standing, they could not meet the prerequisites for class treatment.  Certification requires evidentiary proof of typicality, *i.e.*, that the proposed class representatives and putative class members "have the same or similar injury."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011).  It also demands a showing of commonality, which similarly "requires the plaintiff to demonstrate that the class members have suffered the same injury" as the named plaintiffs.  *Wal-Mart*, 564 U.S. at 350.  Because Plaintiffs' purported injuries arise from labeling statements that were immaterial to the overwhelming majority of putative class members, they cannot establish that they meet these requirements.

<u>**ARGUMENT**</u>

**I.      THE NAMED PLAINTIFFS LACK STANDING**

      **A.      Article III Standing Requires A Showing Of Imminent Injury**

In order to invoke the jurisdiction of the federal courts, a plaintiff seeking injunctive relief must establish "that he faces imminent injury on account of the defendant's conduct."  *Mayfield*, 599 F.3d at 970.  It is not enough that the plaintiff was "expos[ed] to harmful or illegal conduct" in the past.  He must also "show that he faces a 'real or immediate threat . . . . that he will again be wronged in a similar way.'"  *Id.* (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).  Nor can a plaintiff rely on potential ongoing injury to others:  the standing inquiry considers only whether "[the plaintiff] *himself* . . . will again experience injury as a result of th[e] practice."  *Lyons*, 461 U.S. at 108-09 (emphasis added).

For consumer-protection plaintiffs who seek an injunction against an allegedly misleading product label, this means they must show an "imminent" risk that they, personally, will be deceived by the same label again.  *Mayfield*, 599 F.3d at 970.  This is a tall order:  it "may be difficult for a plaintiff to plausibly allege facts to show he or she would be deceived in the future."  *Anderson*, 2016 U.S. Dist. LEXIS 100504, at *21.  Thus, in practice, consumer-protection plaintiffs often lack standing to seek injunctive relief.  As this Court has recognized, however, this is an unavoidable consequence of the reality that "state policy objectives" such as policing food labels "cannot trump

1    Article III's requirements."  *Id.; see also In re Conagra Foods*, 302 F.R.D. 537, 575 (C.D. Cal.

2    2014) ("Article III's standing requirements take precedence over enforcement of state consumer

3    protection laws.").

4         Plaintiffs here attempt to satisfy the standing requirement by claiming that they would be

5    interested in purchasing Coke in the future, if only its label claims were accurate.  (Pls. Br. at 13-14)

6    This is unavailing for two reasons.  First, as Plaintiffs themselves acknowledge, there is no record

7    evidence of the future purchase intentions of at least four of the named plaintiffs—a lacuna that they

8    blame on Coca-Cola's "avoidance" of this issue at those plaintiffs' depositions.  (Pls. Br. at 14 n.9)

9    But "it is the plaintiff's burden to establish standing," *Friends of the Earth, Inc. v. Laidlaw Envtl.*

10   *Servs., Inc.*, 528 U.S. 167, 190 (2000), and the named plaintiffs who were not "examined on the

11   subject" could easily have submitted declarations attesting to their future plans.

12        Second, and more important, even if all of the named plaintiffs had testified that they wished

13   to purchase Coke in the future, that alone is not sufficient to confer standing.  "[A] plaintiff may not

14   manufacture standing for injunctive relief simply by expressing an intent to purchase the challenged

15   product in the future."  *Rahman v. Mott's LLP*, 2014 U.S. Dist. LEXIS 147102, at *17 (N.D. Cal.

16   Oct. 14, 2014).  Rather, the plaintiff must also show that, without an injunction, she is at risk of

17   imminent deception, as when there is an impending change to the relevant qualities of the product

18   itself, as opposed to its label.

19        This Court emphasized this critical distinction in *Anderson*, in which the plaintiffs alleged

20   that the defendant's advertising had deceived them about SeaWorld's treatment of captive orcas, and

21   sought to enjoin similar misleading advertising in the future.  Although the Court concluded that

22   "alleg[ing] the intent to purchase a product in the future" was an essential prerequisite to standing, it

23   did not find that allegation sufficient, on its own, to establish a "realistic threat of future injury."

24   *Anderson*, 2016 U.S. Dist. LEXIS 100504, at *16, *17.  Instead, after canvassing authority on this

25   issue, this Court found that the crucial question was whether the consumer plaintiff had shown an

26   ongoing "inability to rely on representations about a product," such as where the manufacturer

27   evinced an intention to "change or reconstitute the product . . . to conform to the representations on

28

the label." *Id.* at *19 (citing *Lilly v. Jamba Juice Co.*, 2015 U.S. Dist. LEXIS 34498 (N.D. Cal. Mar. 18, 2015)).[12]   The Court contrasted such a situation with the one presented in *Duran v. Hampton Creek*, 2016 U.S. Dist. LEXIS 41650 (N.D. Cal. Mar. 28, 2016), in which the plaintiff claimed that a vegan spread had been misleadingly labeled as mayonnaise, but acknowledged that he had no interest in purchasing a vegan spread.  In such a case, the Court noted, the plaintiff "'knows what the product is and will remain,'" and thus is at no risk of being misled in the future by its labeling.  *Id.* at *20 (quoting *Duran v. Hampton Creek*, 2016 U.S. Dist. LEXIS 41650, at *7-8).

In *Anderson*, the plaintiffs fell narrowly on the former side of the line.  They alleged in a proposed amended pleading that SeaWorld had announced a plan to phase out the objectionable practices and that, if that occurred, they would "consider purchasing [SeaWorld] tickets or merchandise . . . in the future."  *Anderson*, 2016 U.S. Dist. LEXIS 100504, at *22.  The plaintiffs claimed that this exposed them to ongoing injury because, absent an injunction, "[they] [could] not be sure about the veracity of SeaWorld's claims" about the upcoming change.  *Id.* at *23.  In view of these allegations, the Court found the situation in *Anderson* "distinguishable from . . . *Duran*, in that the product or service at issue may be changing to a product or service the Plaintiffs would want if they could rely on SeaWorld's advertising."  *Id.* at *23-24.  Accordingly, the Court concluded that the plaintiffs could plausibly allege standing in their amended pleading if they included specific "additional allegations regarding the alleged marketing campaign."  *Id.* at *27.  At the same time, the Court emphasized the plaintiffs' burden to adduce evidence supporting those allegations, and explicitly invited SeaWorld to "renew its argument that Plaintiffs lack Article III standing to seek injunctive relief . . . in opposition to a motion for class certification" if no such evidence materialized.  *Id* at *24.[13]

---

[12] To the extent that the court in *Lilly* also considered potential injury to a "hypothetical consumer," that was an improper consideration in the Article III standing analysis which, as set forth above, focuses on the prospect of injury to the *plaintiff himself*.  *Lyons*, 461 U.S. at 108-09.

[13] As this Court noted in *Anderson*, Article III standing for consumer-protection claims is the subject of a split of authority in this Circuit, with some courts taking the more restrictive view that a plaintiff who has already learned of a misleading representation can never have standing to pursue injunctive relief.  *See Anderson*, 2016 U.S. Dist. LEXIS 100504, at *17 (collecting cases).  Because Plaintiffs lack standing under either view, Coca-Cola does not argue the merits of the more restrictive view here.

The nuanced analysis that this Court articulated in *Anderson* has been applied by other courts to conclude that consumer-protection plaintiffs lack standing where, as here, they are at no imminent risk of future deception.  In *Rahman*, for example, the court held that a plaintiff did not have standing to seek to enjoin a "No Sugar Added" claim on apple juice because, by then, he was "fully aware that 'No Sugar Added' simply means that no sugar was added to a product," and would not be misled by that statement again.  *Rahman*, 2014 U.S. Dist. LEXIS 147102, at *17.  The plaintiff's testimony that "he wishe[d] to purchase [the product] again in the future if the challenged statement w[ere] removed from the label" made no difference because no change to the *product* was forthcoming: "the apple juice would have as much natural sugar as ever."  *Id.*  The plaintiff thus could not "plausibly prove that he w[ould], in the future, rely on the . . . statement to his detriment."  *Id.* at *18-19; *see also Anderson v. Hain Celestial Gr.*, 87 F. Supp. 3d 1226, 1235 (N.D. Cal. 2015) (no standing to pursue injunctive relief where plaintiff "still would not purchase Defendant's products even if it was ordered to remove the 'All Natural' label; the offensive unnatural ingredients would still be there"); *Lucas v. Jos. A. Bank Clothiers, Inc.*, 2015 U.S. Dist. LEXIS 61550, at *12-13 (S.D. Cal May 8, 2015) (no standing where, absent injunctive relief, plaintiffs would have "the same information that they'd have if the Court entered the requested injunction"); *Profant v. Have Trunk Will Travel*, 2011 U.S. Dist. LEXIS 139248, at *14 (C.D. Cal. Nov. 29, 2011) (plaintiffs must be "realistically threatened by Defendants' future conduct," not simply "allege that they will face future harm by not being able to trust Defendants.").[14]

The cases Plaintiffs rely upon, by contrast, involve situations similar to *Anderson*, where the apprehension of future change created a risk of ongoing confusion.  *See Coe v. General Mills, Inc.*, 2017 U.S. Dist. LEXIS 16581, at *4-5 (N.D. Cal. Feb. 6, 2017) (finding a "possibility of confusion .

---

[14] Judge Gonzalez Rogers's decision in *Reese v. Odwalla, Inc.*, 2017 U.S. Dist. LEXIS 20208, at *16-18 (N.D. Cal. Feb. 13, 2017), is not to the contrary.  There, the defendants argued that the plaintiffs lacked standing because defendants had "ceased the use of [the allegedly misleading statements] on their labels," so the plaintiffs' claims were moot.  The court found that "further development of the factual record [was] necessary" to determine whether the misleading conduct might recur, so it deferred the standing issue to a later date.  *Id.* at *18.  It did not reach the question presented here—whether, assuming that the purportedly misleading labeling practices continue, the named plaintiffs are at risk of "imminent injury" as a result.

. . since it [was] possible that Defendant w[ould] change the composition of the product"); *Ries v. Ariz. Bevs. USA, LLC*, 287 F.R.D. 523, 533 (N.D. Cal. 2012) (finding that, absent injunctive relief, Plaintiffs "could not rely on [the challenged] representation with any confidence.").[15] They do not undermine the principle that, when there is no imminent or even realistic prospect of such a change, the plaintiff's mere "expos[ure] to an allegedly unlawful label is not a cognizable harm." *Rahman*, 2014 U.S. Dist. LEXIS 147102, at *18.

**B.    Plaintiffs' Inability To Show Imminent Injury Deprives Them Of Article III Standing**

Applying the reasoning of *Anderson* to Plaintiffs' claims, it is clear that they cannot establish Article III standing to seek injunctive relief.  Because phosphoric acid has always appeared on Coca-Cola's ingredient list, the only injury Plaintiffs have ever claimed is that they were misled as to that ingredient's ***function*** as an artificial flavor and preservative.  But all of the named plaintiffs now hold the firm belief that phosphoric acid falls into both categories, as they unequivocally allege in their pleadings.  *See* CAC ¶¶ 62, 94; Lazaroff AC ¶¶ 55, 90; Marino AC ¶¶ 57, 94; Sowizrol AC ¶¶ 51, 86.  Accordingly, Plaintiffs can never again be deceived by the disputed label statements:  Coke's current ingredient panel, which lists phosphoric acid, provides them with all the information they need to conclude that the product contains an ingredient they regard as both an artificial flavor and a preservative.  Unlike the plaintiffs in *Anderson*, Plaintiffs do not need an injunction to "be sure about the veracity" of the Pemberton claim, or about the function of phosphoric acid in Coke.  *Anderson*, 2016 U.S. Dist. LEXIS 100504, at *21.[16]

---

[15] These cases arguably extend this Court's rationale in *Anderson* too far, finding that the mere "possibility" of a future product change is enough to confer standing.  This does not satisfy the Article III requirement that the risk of injury to the named plaintiff be "imminent."  Moreover, the *Ries* court based its holding partly on the infirm policy-based rationale this Court has explicitly rejected:  that if a showing of imminent injury were required, "injunctive relief would never be available in false advertising cases, a wholly unrealistic result."  *Ries*, 287 F.R.D. at 533.  But even the expansive logic of these decisions would not save Plaintiffs here.  The record is devoid of even an *allegation*, let alone an evidentiary showing, that Coca-Cola plans to change the formula for Coke.

[16] This reasoning applies with equal force to Plaintiffs' attack on the Original Formula claim.  Although this Court has now twice dismissed Plaintiffs' allegations related to that claim (*see* Order on Motion to Dismiss (No. 13-cv-3990, Dkt. No. 73) at 8; Order on Summary Judgment (Dkt. No. 116) at 9-15), Plaintiffs insist that the Original Formula claim remains at issue because it "*reinforced* both the Pemberton Claim and the Ingredient List claim."  (Pls. Br. at 3 n.6 (emphasis added.)  Even

Plaintiffs attempt to get around this obstacle by speculating in their class certification motion that Coca-Cola might someday "cease using phosphoric acid in Coke." (Pls. Br. at 14)  That prospect is, to put it mildly, remote:  phosphoric acid is a mainstay of the Coke formula, having been used in the beverage for more than a century.  Plaintiffs cannot base a showing of imminent injury on such a far-flung possibility.  *See Mayfield*, 599 F.3d at 970 ("[S]peculation or subjective apprehension about future harm" cannot confer standing).  In any event, this theory of injury makes no sense.  If, against all odds, Coca-Cola were to remove phosphoric acid from Coke, Plaintiffs would not need an injunction to discern that change:  they would see that phosphoric acid had been dropped from the ingredient list.  Accordingly, without injunctive relief, they "would be left with the same information they'd have if the Court entered the requested injunction." *Lucas*, 2015 U.S. Dist. LEXIS 61550, at *12-13.

Plaintiffs' inability to establish Article III standing is positively fatal to their motion for class certification.  "Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief." *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999).  As this Court once put it, Plaintiffs "cannot rely on the prospect of future injury to unnamed class members if they cannot establish that they have standing to seek injunctive relief" themselves. *Castagnola v. Hewlett-Packard Co.*, 2012 U.S. Dist. LEXIS 82026, at *14 (N.D. Ca. June 13, 2012) (White, *J.*)

That is the situation here.  Plaintiffs lack constitutional standing to seek injunctive relief for themselves, so they cannot do so on behalf of a class.  For this reason alone, their certification motion must be denied.

### C.  The Massachusetts, New York And New Jersey Plaintiffs Also Lack Statutory Standing To Pursue Their Consumer-Protection Claims

As set forth above, all of the named plaintiffs lack Article III standing to pursue claims for injunctive relief.  But the named plaintiffs from Massachusetts, New York and New Jersey have also

---

assuming that this theory has somehow survived the Court's prior rulings, Plaintiffs cannot have standing to seek an injunction against a statement that merely "reinforces" other statements that pose no imminent threat to them, and that they lack standing to enjoin.

failed to meet a core requirement necessary to establish standing under those states' consumer-protection statutes:  a showing of quantifiable injury.  Under these states' consumer-protection laws, it is not sufficient to claim that the purported misrepresentation induced the plaintiff to purchase a product or service he otherwise would not have bought.  Rather, in order to have standing under each statute, the plaintiff must show that the product she purchased was "worth less than the selling price," by reference to standards other than "the plaintiff's subjective belief as to the nature of the value she received."  *See Shaulis v. Nordstrom Inc.*, 120 F. Supp. 3d 40, 52 (D. Mass. 2015); *Small v. Lorillard Tobacco Co.*, 94 N.Y. 2d 43, 56 (1999) (rejecting the theory that "consumers who buy a product that they would not have purchased, absent a manufacturer's deceptive commercial practices, have suffered an injury under [GBL] § 349" without an additional showing "that the cost of the purchased product was affected by the alleged misrepresentation"); *Mason v. Coca-Cola Co.*, 774 F. Supp. 2d 699, 703-04 (D.N.J. 2011) (allegations that the plaintiffs "were persuaded to purchase the product" by the alleged misrepresentations insufficient to establish ascertainable loss absent additional "expla[nation] how they experienced any out-of-pocket loss because of their purchases").

The named plaintiffs cannot meet these statutory standing requirements.  They have made no showing that the alleged misrepresentations affected the price of Coke in any way, let alone that the disputed statements or omissions caused them to pay more for Coke than it was worth.  Indeed, Mr. Poret's survey—the only evidence in the record on this issue—conclusively establishes that the claims have no impact on the price consumers are willing to pay for Coke.  *See* Metcalf Decl., Ex. 1 (Poret Report).  For this reason, too, the Massachusetts, New York and New Jersey plaintiffs cannot obtain certification of any class.

## II.    PLAINTIFFS HAVE NOT MET THE REQUIREMENTS OF RULE 23(a)

### A.    Plaintiffs' Heavy Evidentiary Burden

Even if they could somehow get past their own lack of constitutional and statutory standing to seek injunctive relief, Plaintiffs' motion for certification under Rule 23(b)(2) would still be doomed.  As Plaintiffs note, unlike a damages class under Rule 23(b)(3), Rule 23(b)(2) "does not

require" them to "demonstrat[e] that common questions of law or fact predominate over individualized ones." (Pls. Br. at 11-12) But that does not mean that certification of an injunctive class is automatic. To the contrary, the Rule 23(b)(2) bar is, if anything, higher than the standard under Rule 23(b)(3).

A certification order under Rule 23(b)(2) results in a judgment that applies to all class members, with no right to opt out. Accordingly, "[a]s all class members will be bound by a single judgment, members of a proposed Rule 23(b)(2) injunctive or declaratory class must have strong commonality of interests." *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 264 (3d Cir. 2011). Where there are "disparate factual circumstances [among] class members," those distinctions "may prevent a class from being cohesive and, therefore, make the class unable to be certified under Rule 23(b)(2)." Indeed, "a (b)(2) class may require *more* cohesiveness than a (b)(3) class." *Id.* (internal quotation marks omitted) (denying class certification on toxic tort claims in view of individualized variations among class members' exposure level and injuries); *see also Holmes v. Continental Can Co.*, 706 F.2d 1144, 1155 n.8 (11th Cir. 1983) (noting that "[i]njuries remedied through (b)(2) actions are really group, as opposed to individual[,] injuries.").

Irrespective of how the Rule (b)(2) burden stacks up against the requirements of Rule 23(b)(3), there can be no dispute that Plaintiffs must satisfy all of the prerequisites of Rule 23(a). This requires, *inter alia*, a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class" and that "there are questions of law or fact common to the class." *See* Fed. R. Civ. P. 23(a)(2)-(3).[17] Importantly, these requirements of typicality and commonality are not "mere pleading standard[s]." *Wal-Mart*, 564 U.S. at 350. A "party seeking class certification [must] affirmatively demonstrate"—with actual evidence, not just allegations— "compliance with the Rule." *Id.*

### B.    Typicality

Rule 23(a)(3) mandates that "the claims of the representative parties [be] typical of the

---

[17] Coca-Cola does not dispute that Plaintiffs satisfy the "numerosity" requirement of Rule 23(a)(1) or the "adequacy" requirement of Rule 23(a)(4). Coca-Cola also does not oppose the application of Plaintiffs' counsel to be appointed class counsel in the event that the Court certifies a class.

claims . . . of the class." Because they individually lack standing to seek an injunction, the named

plaintiffs by definition are not "typical" of the proposed class, which seeks *only* injunctive relief.[18]

A party that lacks Article III standing has no claim at all. The "claim" of such an individual is in no

way representative, let alone typical, of the claims of the absent class members, who purportedly

have a *bona fide* need for an injunction to protect them from imminent harm. *See Gen. Tel. Co.of*

*the Southwest v. Falcon*, 457 U.S. 147, 156 (1982) (typicality requirement "effectively limit[s] the

class claims to those fairly encompassed by the named plaintiff's claims") (internal quotation marks

omitted); *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 412 (C.D. Cal. 2000) ("The premise of

the typicality requirement is simply stated:  as goes the claims of the named plaintiff, so go the

claims of the class.") (internal quotation marks omitted).

But there is a deeper problem with the proposed class representatives' claims.  In addition to

their lack of standing, the named plaintiffs fail the typicality test because they are quintessential

outliers.  By their own accounts, Plaintiffs were moved to purchase Coke by labeling statements

concerning the presence or absence of artificial flavors and preservatives in the product.  As detailed

above, the vast majority of Coke buyers are *not* influenced by such messages.  The Poret Ingredient

Panel and Full Label Surveys establish that the challenged claims have an impact on, at most, 5% of

Coke consumers. ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

Put differently, statements concerning artificial flavors or preservatives purportedly were

material to the named plaintiffs, but were *not* material not to the overwhelming majority of absent

class members.  That disparity is fatal to Plaintiffs' motion for class certification.  *See Ellis*, 657 F.3d

at 984 (typicality requires that both named class representatives and "other members have the same

---

[18]  Although they seek certification of only a Rule 23(b)(2) injunctive relief class, Plaintiffs make
one stray reference to certification of their "unjust enrichment claims."  (Pls. Br. at 12)  That is a
non-starter:  Rule 23(b)(2) "does not authorize class certification when each class member would be
entitled to an individualized award of monetary damages."  *Wal-Mart*, 564 U.S. at 360-61.

1    or similar injury" and that absent "class members have been injured by the same course of conduct")

2    (internal quotation marks omitted); *see also General Tel. Co.*, 457 U.S. at 156 (typicality requires

3    that class representatives "possess the same interest and suffer the same injury as class members.").

4    The evidence establishes that ***95% or more*** of Coke buyers do not regard information concerning

5    artificial flavors or preservatives to be material to their purchasing decisions.  Rare individuals who

6    claim to be influenced by such factors cannot be "typical" of Coke buyers as a whole.  *See Astiana v.*

7    *Ben & Jerry's Homemade, Inc.*, 2014 U.S. Dist. LEXIS 1640, at *23 (N.D. Cal. Jan. 7, 2014) (no

8    typicality when "97% of consumers" reported that the alleged misrepresentation "did not matter" to

9    them).

10       Plaintiffs' treatment of this issue is superficial at best.  First, they assert that the disputed

11   claims were "material to Coca-Cola."  (Pls. Br. at 19)  But Coca-Cola is not seeking an injunction —

12   the putative class is.  No case holds that materiality to the defendant can substitute for materiality to

13   the plaintiff class.  Second, Plaintiffs argue that a finding of class-wide materiality "corresponds with

14   common[]sense" because the challenged claims "transmit[ted] false information to consumers."

15   (Pls. Br. at 19-20)  That argument, too, is deficient under Rule 23, which demands an evidentiary

16   showing that each Rule 23(a) factor, including the requirement of typicality, is satisfied.  *See Ellis*,

17   657 F.3d at 979 ("Parties seeking class certification bear the burden of demonstrating that they have

18   met each of the four requirements of Fed. R. Civ. P. 23(a).").[19]

19       In other submissions to this Court, Plaintiffs have acknowledged that "whether consumers [as

20   a whole] favorably respond" to the challenged claims is critical to "typicality, and class-wide

21   materiality."  *See* Metcalf Decl., Ex. 9 (Oct. 14, 2016 Joint Discovery Letter (Dkt. No. 135)) at 2-3,

22

23   [19] The cases that Plaintiffs cite in support of this dubious argument are not class-certification rulings,
     and do not address the proof of materiality and injury required to support a motion for class
     certification under state consumer-protection statutes.  (Pls. Br. at 20 n.13)  *See Hinojos v. Kohl's*
24   *Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013) (finding that allegations of materiality to an individual
     plaintiff were sufficient to survive a motion to dismiss); *Commonwealth v. AmCan Enters.*, 712
25   N.E.2d 1205, 1210 (Mass. 1999) (affirming grant of summary judgment to State of Massachusetts on
     issue of whether challenged advertisements were deceptive); *Duncavage v. Allen*, 147 Ill. App. 3d
26   88, 102 (Ill. App. 1986) (affirming, in part, dismissal of ICFA complaint based on landlord's failure
     to disclose certain points of non-compliance with Chicago building codes); *Cox v. Sears Roebuck &*
27   *Co.*, 138 N.J. 2, 22 (1994) (noting, in ruling on motion to dismiss, that NJCFA plaintiff is required to
     show "ascertainable loss.").

28

n.11 (internal quotation marks omitted).  The evidence establishes that there is no such class-wide "respon[se]" to the disputed claims, and belies a finding of class-wide materiality.[20]  In short, if the challenged claims were material to the individual plaintiffs, then the individual plaintiffs are not typical of the class they seek to represent.

### C.      Commonality

In addition to typicality, a party seeking class certification must establish that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Here, Plaintiffs point to issues such as "whether Coca-Cola's ingredient list [], Pemberton claim and/or original formula claim were false, unfair, deceptive, misleading and/or failed to reveal material facts."  (Pls. Br. at 7-8)  These are precisely the types of "questions" that are insufficient to establish commonality under the Rule.

As the Supreme Court has recognized, "any competently crafted class complaint literally raises common questions."  *Wal-Mart,* 564 U.S. at 349.  But merely "[r]eciting these questions is not sufficient" to demonstrate commonality.  *Id.*  Rule 23(a)(2) is more demanding and "requires the plaintiff to demonstrate that the class members have *suffered the same injury*, [which] does not mean merely that they have all suffered a violation of the same provision of law."  *Id*. at 350 (emphasis added).  Rather, the claims of the class "must depend on a common contention . . . capable of class-wide resolution," whose determination "will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*

That is not the case here.  As detailed above, the countless members of the proposed class of

---

[20] Plaintiffs' position that this Court must disregard this overwhelming evidence, and permit materiality to be decided as a "jury question," (Pls. Br. at 18) is spurious.  In each of the cases that Plaintiffs rely upon, the record on class certification contained persuasive evidence of the disputed claims' materiality to putative class members.  *See McCrary v. Elations Co., LLC*, 2014 U.S. Dist. LEXIS 8443, at *43 (C.D. Cal. Jan. 13, 2014) (granting class certification where defendant's own survey showed the claims were material to 75 percent of class members); *In re Conagra Foods, Inc.*, 90 F. Supp. 3d 919, 1019 (C.D. Cal. 2015)  (same where survey showed the claims were material to more than half); *Ortega v. Natural Balance*, 300 F.R.D. 422, 429 (C.D. Cal. 2014) (same where plaintiffs asserted that "nearly all of the statements on [the product's] packaging"—including the product's name—were misleading, and neither side presented survey evidence on class certification).  Here, by contrast, the undisputed evidence conclusively establishes that the claims are *not* material to the vast majority of class members.  Courts in this Circuit have consistently denied class certification under these circumstances.  *See infra* at 27 and n.22.

Coca-Cola purchasers in six states have not "suffered the same injury," because the disputed claims were not material to the vast majority of them.  At most, a tiny portion of the absent class members was injured in the manner Plaintiffs allege.  There is no common injury and no possibility of resolving a "central" issue "in one stroke."  *Wal-Mart*, 564 U.S. at 350.

An examination of the substantive law of the six states under which Plaintiffs assert claims underscores this conclusion.  Four states—Illinois, New Jersey, Florida and Massachusetts—require a subjective showing that the disputed claims were material to *each* member of the putative class.  In Illinois, for example, a plaintiff must show that the alleged "deceptive marketing induced each class member to purchase" the product in question.  *Oshana v. Coca-Cola Co.*, 225 F.R.D. 575, 582 (N.D. Ill. 2005) (emphasis added), *affirmed*, 472 F.3d 506 (7th Cir. 2006).  This is typically "impossible to prove on a class-wide basis" as "marketing may be just one of the many reasons for an individual's decision to purchase the product."  *Id.  Accord Mann v. TD Bank, N.A.*, 2010 U.S. Dist. LEXIS 112085, at *18-19 (D.N.J. Oct. 20, 2010) (New Jersey Consumer Fraud Act requires a class certification proponent to show that "all class members. . . suffer[ed] their own individual 'ascertainable loss'"); *Hutson v. Rexall Sundown, Inc.*, 837 So. 2d 1090, 1093 (Fl. App. Ct. 2003) (under Florida Deceptive and Unfair Trade Practices Act, putative class members who have not "suffered any damages as a result of the alleged deceptive trade practice . . . have no cause of action."); *Bellermann v. Fitchburg Gas and Elec. Lighting Co.*, 470 Mass. 43, 57 (Mass. 2014) (Massachusetts plaintiffs seeking certification of claims under Chapter 93A "must show that they can establish causation [and] injury on a class-wide basis"; class treatment is inappropriate where determination of each plaintiff's injury "would necessitate individualized inquiry regarding the counterfactual mental processes of each class member.").

The two remaining states—New York and California—apply an objective inquiry under which reliance and injury may be imputed to the class if "a reasonable consumer w[ould be] misled" by the challenged claim.[21]  *See Hughes v. Ester C Co.*, 317 F.R.D. 333, 345 (S.D.N.Y. 2016); *Brown*

---

[21] Under GBL § 350, by contrast, each plaintiff "must . . .  demonstrate reliance on defendants' false advertising."  *Ackerman v. Coca-Cola Co.*, 2013 U.S. Dist. LEXIS 184232, at *10 (E.D.N.Y. July 17, 2013).

*v. Hain Celestial Gr.*, 2014 U.S. Dist. LEXIS 161036, at *34 (N.D. Cal. Nov. 14, 2014) (class-wide inferences of reliance and causation available where "an objective reasonable consumer would deem the [challenged] claim material."). But where, as here, the evidence establishes that the challenged representations are *immaterial* to the vast majority of putative class members, the "reasonable consumer" standard is not satisfied, and reliance and injury cannot be presumed. This, in turn, defeats a showing of commonality. *See, e.g., Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 457 (S.D. Cal. May 12, 2014) (where evidence showed that claims were material to only 9-14% of purchasers, "whether [the defendant's] conduct was . . . likely to deceive is not subject to common proof on a class-wide basis.").[22]

Moreover, because the Pemberton and Original Formula claims appeared on only a subset of Coke labels during the putative class period—less than 20 percent, in the case of the Pemberton claim—a significant number of class members *did not even see* all of the challenged claims. In these circumstances, questions such as materiality, deception, reliance and injury are not subject to resolution through class-wide proof. *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) ("certification of UCL claims is available only to those class members who were *actually exposed* to the business practices at issue") (overruled in part on other grounds by *Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017)); *Moore v. Apple, Inc.*, 309 F.R.D. 532, 541-42 (N.D. Cal. 2015) (if the proposed class definition "is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad") (internal quotation marks omitted); *Goldemberg v. Johnson & Johnson Consumer Cos.*, 317 F.R.D. 374, 389 (S.D.N.Y. 2016) (certification inappropriate where "the content of the advertising varied widely and not all the advertisements

---

[22] *See also Turcios v. Carma Labs, Inc.*, 296 F.R.D. 638, 646 (C.D. Cal. 2014) ("materiality [is] not subject to common proof" in view of "evidence that consumers' behavior varies even where there is a common awareness of the alleged misrepresentation"); *Johnson v. Harley-Davidson Motor Co. Gr., LLC*, 285 F.R.D. 573, 581 (E.D. Cal. 2012) (finding that commonality requirement was not satisfied in view of "persuasive evidence that [alleged] defect would not be material to many . . . consumers" and that, accordingly, "materiality is not an issue subject to common, rather than individualized, proof"); *Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217, 229 (N.D. Cal. 2015) (finding that Rule 23(a)(2) was not satisfied in light of plaintiffs' failure to "offer evidence that the materiality of the alleged unlawful, deceptive, or misleading statements could be shown on a class-wide basis").

contained the alleged misrepresentations").  The irregularity with which the disputed claims appeared on Coke labels throughout the putative class period is thus another factor that precludes a showing of commonality.

## CONCLUSION

Class certification is "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only[.]'"  *Wal-Mart*, 564 U.S. at 348 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  Its proponents must "justify a departure" from the norm by showing that they are "appropriate representatives of the class whose claims they wish to litigate."  *Id.* at 349.

Despite ample opportunity, Plaintiffs have utterly failed to make this showing.  They cannot be "appropriate representatives" when they, themselves, lack standing to pursue their claims, or when, at best, a tiny fraction of absent class members suffered the injury that Plaintiffs allege.  Plaintiffs' motion for class certification should be denied.


DATE:  July 21, 2017                          Respectfully submitted,

                                              PATTERSON BELKNAP WEBB & TYLER LLP


                                              _____/s/ Steven A. Zalesin_____
                                              Steven A. Zalesin (admitted *pro hac vice*)
                                              Email:  sazalesin@pbwt.com
                                              Travis J. Tu (admitted *pro hac vice*)
                                              Michelle W. Cohen (admitted *pro hac vice*)
                                              1133 Avenue of the Americas
                                              New York, New York 10036
                                              Telephone:  (212) 336-2000
                                              Facsimile:  (212) 336-2222

                                              SHOOK, HARDY & BACON LLP
                                              Tammy B. Webb (SBN 22759)
                                              Email:  tbwebb@shb.com
                                              One Montgomery Tower, Suite 2700
                                              San Francisco, California 94104
                                              Telephone:  (415) 544-1904
                                              Facsimile:  (415) 391-0281

                                              *Attorneys for Defendants*